577 So.2d 209 (1991)
STATE of Louisiana
v.
Brian BRUCE.
No. KA 90 0562.
Court of Appeal of Louisiana, First Circuit.
March 5, 1991.
Writ Denied May 24, 1991.
Bryan Bush, Dist. Atty., by Jessie Bankston, Asst. Dist. Atty., Office of Dist. Atty., Baton Rouge, for plaintiff, appellee.
Robert Klenipeter, Baton Rouge, for defendant, appellant.
*210 Before EDWARDS, WATKINS and LeBLANC, JJ.
EDWARDS, Judge.
Defendant, Brian Bruce, was charged in a two-count indictment with the commission of molestation of a juvenile over whom he had control or supervision against a four-year-old boy (count 1) and against a five-year-old boy (count 2), violations of LSA-R.S. 14:81.2. Defendant was tried by a jury which convicted him as charged on count 1 and acquitted him on count 2. The trial court sentenced him to imprisonment at hard labor for a term of fifteen years. The sentence was suspended and defendant was placed on active supervised probation for five years, subject to general and specific conditions. Defendant's motion for post verdict judgment of acquittal and/or new trial was denied. Defendant now appeals his conviction on count one.

FACTS
The testimony elicited at trial reflects the following sequence of events:
In the spring of 1987, the victim's parents began sending him to the Baton Rouge Speech and Hearing Foundation where he was given individual speech therapy, once a week, for a speech impediment. The child then attended a special summer school program at the Foundation and was subsequently enrolled in the 1987 fall semester of daily instruction at the Foundation in September. During the fall semester, every morning until noon, the child attended a class taught by Charlotte Sartain Provensa, while the defendant taught another class in a classroom across the hall. Each day at 12:30, after lunch, the child went to the defendant's classroom where the defendant supervised him and the other preschool and kindergarten children who stayed at school in the afternoon until 2:00 or 2:15 p.m. Because the child's mother worked, the child's maternal grandmother transported him to and from school on a regular basis.
The child's parents and grandmother testified that in September, 1987, the child began to display certain behavorial changes which caused them concern. Specifically, they recounted that the child initially loved school and frequently came home with papers to show and stories to tell. Suddenly, the child began to display an unusual dislike for school, an unwillingness to get out of bed in the mornings, and a reluctance to talk with them about school. The child, who had been toilet trained, also began soiling his pants.
The child's ten-year-old brother testified that he and the child had frequently bathed together and that one day, the child grabbed his penis, and tried to put it in his mouth. The brother informed his mother of the child's behavior, and she instructed the two to stop bathing together.
One day, on or about October 6, 1987, the child's grandmother was about five or ten minutes late in arriving at the Foundation to pick up the child after school. When she arrived at the school, she went to defendant's classroom where she ordinarily picked up the child. Finding no one in the classroom, she went outside to look for him in the playground. She reentered the school building and encountered Marguerite "Boots" Baronne, a teacher's aide, who helped her look for the child. They went back to defendant's classroom, calling out the child's name. Once they were inside the classroom, a door to the supply closet, located adjacent to the classroom, opened and the defendant and the child exited the closet. The grandmother testified that she and the child then left the school.
In early November, the child's mother and the grandmother conferred with one another about the various behavioral changes in the child. The grandmother related the October 6 closet incident to the mother, and together they concluded that there was "something going on." They next talked to a friend who was affiliated with the police, and on approximately November 9, 1987, they reported the matter to the police. The victim's father testified that he first learned of the incident when his wife and her mother telephoned him from the police station and informed him of their actions. He later had a conversation with the child, after which he went to the *211 police station and signed a sworn affidavit for defendant's arrest.
At the recommendation of the police, the child was examined by a doctor. The examination, performed by Dr. B.F. Thompson, failed to show any evidence that the child had been sexually abused.
The child's parents then removed him from school at the Foundation and placed him in another school.
The parents testified that they took the child to the District Attorney's office on several occasions. On these occasions, the child would be taken into a separate room with a District Attorney's office representative. No one else was present at these meetings, and there was no testimony at the trial regarding the content of these sessions.
At the recommendation of the District Attorney's office, the parents took the child to a clinical psychologist, Dr. Allen Taylor. Dr. Taylor conducted an initial series of six sessions with the child on February 1, 3, 17, and 23, 1988, and March 9 and 17, 1988. Dr. Taylor testified that the child was extremely reluctant to talk, and shook his head vigorously in response to questions or statements regarding the alleged abuse. In order to aid the child's communication, Dr. Taylor employed the use of anatomically correct dolls. He testified that the use of these dolls to determine the occurrence of sexual abuse in children is highly controversial, however, he utilizes them when working with developmentally handicapped children. He used them in this case based on the child's unwillingness to communicate and in light of the child's speech and language delay. Dr. Taylor concluded these sessions in March since he felt it unlikely that the child would be or could be cooperative with further prodding and that the child had given all the information that he was capable of giving at the time.
Approximately eight months later,[1] Dr. Taylor saw the child again. This time, Dr. Taylor noted that the child was much more verbal and much more interested in and able to communicate. The child did continue to display some reluctance to talk; the reluctance was "much more confined to the doll play and the accounts of what had happened." He again employed the use of the anatomically correct dolls in his sessions with the child. Dr. Taylor testified that, based upon his observations of the child engaged in doll play and of the child's accompanying verbalizations, in his expert opinion, the child had been abused.
Approximately nine months after the second set of sessions with Dr. Taylor, the trial in the matter was held. The child testified at trial as follows:
Q. Do you remember a man named Mr. B.B.?[2]
A. Yes, Sir.
Q. And how do you know Mr. B.B.?
A. Where I go to school.
Q. Where you go to school?
A. Yes, Ma'am.
Q. Do you like Mr. B.B.?
A. No.
Q. No.
Mr. Kleinpeter: I object now, may it please the court. I haven't heard the child say anything.
The court: He nodded his head.
By Ms. Bernie.
Q. Can you answer that question with a word?
A. Yes.
Q. Do you like Mr. B.B.?
A. No, Ma'am.
Q. Did he do something that made you not like him?
A. Yes.
Q. Did you answer with a word?
A. Yes, Ma'am.
Q. Can you tell us what Mr. B.B. did that made you not like him? Did he do something to you?

*212 A. Yes, Sir.
Q. Did he touch you?
A. Yes.
Q. Can you tell us where he touched you?
A. Wrong place.
Q. Can you show us where that wrong place is?
Ms. Bernie: I would like the record to reflect the witness touched his genitals.
By Ms. Bernie.
Q. Did you want him to do that?
A. No.
Q. And what did you do when he did that?
A. Nothing.
Q. Nothing. Where were you when he did that?
A. In the closet.
Q. In the closet. Where was the closet?
A. By the bathroom.
Q. Was that near your classroom at school?
A. Yes, Sir.
Q. Did Mr. B.B. make you do anything to him?
A. No.
Q. Did he try?
A. No, Ma'am.
Mr. Kleinpeter: I object. This child ishe said he did not make him do anything.
The court: Sustained.
By Ms. Bernie.
Q. Did Mr. B.B. ever hurt you any other way?
A. No.
Q. [Child], are you telling us the truth?
A. Yes.
The defendant also testified at trial. He began working at the Foundation in 1973 and worked there continuously up to the time of his arrest in November, 1988. He denied ever having touched or made an improper move toward any child at the Foundation, particularly the two children specified in the charges. He particularly denied ever having attempted to sexually abuse any child. When questioned about the October 6, 1987, closet incident, his testimony was as follows:
A. Yes, I remember that.
Q. What happened on that date?
A. Well, as far as I remember it was a fairly normal day. There were about five or six children in the class. At 2:15 when it was time for the parents to come, I asked one of the children to open the door and when the parents came in, I gave some of them,I matched the children to the right parents and then there were two or threeI guess two children that went across the hall to day care because their parents worked. I took them across the hall. When I came back
Q. Let's stop there. You had a day care for people who worked and could not come at 2:15?
A. Yes.
Q. You took two children over there?
A. Yes, Sir, I did. And then I came right back and [child's] grandmother who was not thereand [child]I had left him in the room just as I walked across the hall. When I came back he was gone. I was concerned because you know when you lose a child in a school, you become concerned about what could happen to them.
Q. Did you have problem [sic] with him hiding?
A. Yes, Sir, I have. That was one of the games he played.
Q. What did you do?
A. When I saw he was not in the classroom, I looked everywhere I could in the classroom. I did not see him under the desks or the chairs. I went down the hall away from the office tothe offices which are a number of rooms
Q. Is that the exit toward the street?
A. There is another exit away from the regular exit, but there is another exit the other way, and I was concerned he might go out that exit.
Q. Had you thought of looking in the bathroom or the closet prior to that time?
A. No, Sir, I had not.

*213 Q. Were you more concerned about him getting out of the building?
A. Yes, certainly. I went down that hall and checked every one of those rooms. And when I did not find him, I came back to the classroom and I checked the other classrooms too, and when I came back to the classroom where he started, and when I did not see him again, I looked in the bathroom and then I noticed a door to the closet was closed and I opened it up and there he was.
Q. What did he do? Did he come out?
A. No. He was kind of playing. So, I just asked him, I said, let's go, (child).
Q. Did he come?
A. Yes, he did.
Glynda Barnes, the Director of the Foundation at the time of the incident, testified at trial. She testified that the Foundation had an open-door policy whereby parents and teachers were able and encouraged to observe the classroom settings and their teachers at any time. Each classroom had one wall which was a one-way mirror, and usually an open window on the opposite wall. She had no first-hand knowledge about the October 6 closet incident; however, she stated that she was very much aware of this particular child's propensity for hiding, as the other teachers had talked about having to look for him on occasion because he liked to hide for fun.
Charlotte Provensa, a teacher at the Foundation, testified that "it was not unusual at all for (the child and two other children) to go run and hide in the closet. It happened frequently." Typically, she said it was this particular child (the alleged victim) who went into the closet.
Elizabeth Welch, a teacher and speech therapist at the Foundation, testified that she taught in the classroom directly across from the defendant. She stated that she had open accessibility to the same closet, and that she was frequently in and out of the closet on a daily basis getting supplies.
Marguerite Baronne, the teacher's aide who helped the child's grandmother look for him on the afternoon of October 6, 1987, testified that she and the grandmother went into defendant's classroom to look for the child and that, once she stepped into the classroom, she observed the defendant with the child, standing in the hallway right outside the storage closet. She testified that the child was fully clothed and she saw nothing alarming, out of the ordinary, or unusual about the situation.
Several other witnesses, including teachers and parents of students at the Foundation, testified regarding the good character and reputation of the defendant.
At trial, the defendant elicited the testimony of two clinical psychologists, William Owen Scott and Mary Lou Kelly, who performed a joint evaluation of Dr. Taylor's report. They testified that they found significant problems with Taylor's report. Primarily, they objected to his reliance on the use of the anatomically correct dolls in reaching his conclusion that the child had been abused, when it is "very clear and widely accepted that dolls should not be used to draw conclusions about whether or not a child was sexually abused." Their own findings regarding whether sexual abuse had occurred or whether this defendant abused the child were inconclusive; they had not themselves examined the child and their findings were restricted to their review of Dr. Taylor's report.
All three psychologists, Drs. Taylor, Scott, and Kelly, testified that the behavioral changes in the child (sudden dislike for school, soiling his pants, etc.), while consistent with sexual abuse, are likewise indicative of other, unrelated psychological problems, and that the exact cause of such changes was indeterminable.

COMPETENCY OF THE CHILD
Defendant first argues that the trial court erred in ruling that the child was competent to testify. A review of the record reveals that defendant failed to enter a contemporaneous objection to the child's competency as required by LSA-C. Cr.P. art. 841. Therefore, this assignment of error has no merit.

*214 SUFFICIENCY OF THE EVIDENCE
Defendant next asserts that the evidence was insufficient to support a conviction on the crime charged in count 1.
In reviewing the sufficiency of the evidence, we are controlled by the standard enunciated by the Supreme Court of the United States in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), now codified in LSA-C.Cr.P. art. 821. Under that standard, the evidence, viewed in the light most favorable to the prosecution, must be sufficient to convince a rational trier of fact that all of the elements of the crime have been proved beyond a reasonable doubt. State v. Jacobs, 504 So.2d 817 (La.1987). The explicit right of a person accused of a crime to be presumed innocent until proven guilty provides an additional guarantee against criminal conviction based on inadequate evidence. La. Const., Art. 1, § 16; State v. Mussall, 523 So.2d 1305 (La.1988).
The elements of the crime of molestation of a juvenile are set out in LSA-R.S. 14:81.2, which provides in pertinent part:
A. Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of... influence by virtue of a position of control or supervision over the juvenile.
When circumstantial evidence is used in proving the commission of an offense, the evidentiary standard of LSA-R.S. 15:438 forms part of the broader inquiry in assessing the sufficiency of the evidence under the Jackson standard of appellate review. LSA-R.S. 15:438 states: "... assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." This is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test.... Ultimately all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965 (La.1986).
In evaluating the sufficiency of the evidence to convict this defendant, we are guided by the conclusions reached by our Supreme Court in State v. Mussall, 523 So.2d 1305 (La.1988), regarding the application of the Jackson standard. In Mussall, the Louisiana Supreme Court stated:
The principal criterion of a Jackson v. Virginia review is rationality. This is because under Winship and Jackson Fourteenth Amendment due process demands that in state trials, as has been demanded traditionally in federal trials, a criminal conviction cannot constitutionally stand if it is based on a record from which no rational trier of fact could find guilt beyond a reasonable doubt. Accordingly, under the Jackson methodology a reviewing court is required to view the evidence from the perspective of a hypothetical rational trier of fact in determining whether such an unconstitutional conviction has occurred. In reviewing the evidence, the whole record must be considered because a rational trier of fact would consider all of the evidence, and the actual trier of fact is presumed to have acted rationally until it appears otherwise. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
The Jackson doctrine or methodology is a compromise between the one extreme that maximizes the protection against the risk that innocent persons will be erroneously convicted by appellate replication of criminal trials and the *215 other extreme that places the greatest faith in the ability of the triers of facts to produce just verdicts. Not only did the Supreme Court abjure any requirement that a reviewing court retry the issue of guilt, but it also rejected all forms of limited review under which a partial or one-dimensional view of the evidence is accepted as an index of its actual probative value. The Jackson doctrine does not permit the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt. Nor does it require a court to decide whether, based on the entire record, the average rational trier of fact could be convinced of guilt beyond a reasonable doubt. And of course, the high court abrogated the "no evidence" rule of Thompson v. Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) because "it could not seriously be argued that ... a modicum of evidence could by itself rationally support a conviction beyond a reasonable doubt." [emphasis in original; footnotes omitted]
State v. Mussall, 523 So.2d at 1310.
This interpretation of the Jackson standard has influenced our courts since State v. Mussall, supra. See State v. Lubrano, 563 So.2d 847, 850 (La.1990); State v. Burger, 541 So.2d 842 (La.1989) (writ granted and remanded to Court of Appeal for reconsideration in light of State v. Mussall), 550 So.2d 1282 (La.App. 4th Cir.1989), cert. denied, 556 So.2d 1276 (La.1990); State v. Bay, 529 So.2d 845, 851 (La.1988); State v. Daigrepont, 560 So.2d 959 (La.App. 3d Cir.), cert. denied, 566 So.2d 396 (La.1990); State v. Fuqua, 558 So.2d 740, 742 (La. App. 3d Cir.), cert. denied, 565 So.2d 442 (La.1990); State v. Toups, 546 So.2d 549 (La.App. 1st Cir.1989); State v. Barrett, 544 So.2d 654, 659 (La.App. 3d Cir.), cert. denied, 551 So.2d 1336 (La.1989); State v. Cashen, 544 So.2d 1268, 1275 (La.App. 4th Cir.1989); State v. Thomas, 538 So.2d 1021 (La.App. 3d Cir.1988); State v. Meredith, 536 So.2d 555 (La.App. 1st Cir.1988), cert. denied, 544 So.2d 396 (La.1989).
After a thorough review of the record in the present case, we find that the prosecution established the following elements of the crime charged by direct evidence: (1) that the defendant was 41 years old; (2) that the child was four years old; and (3) that the defendant had a position of control or supervision over the child. We now evaluate the remaining evidence, in the light most favorable to the prosecution, to determine whether it is sufficient to convince a rational trier of fact that the defendant, Bruce, committed a lewd or lascivious act upon the four-year-old child, with the intention of arousing or gratifying the sexual desires of either person.
The remaining evidence boils down to the October 6, 1987, closet incident and the child's testimony at trial.[3] With regard to the closet incident, we find the hypothesis of innocence presented by the defendant sufficiently reasonable that any rational trier of fact would have a reasonable doubt as to defendant's guilt. According to the defendant, the child was hiding in the closet. He had just found the child and they were both exiting the closet when the child's grandmother and the teacher's aide, Marguerite Baronne, entered the classroom.
The defendant's explanation regarding the incident on October 6, 1987, was supported by the testimony of the director of the Foundation, Glynda Barnes, and by another teacher at the Foundation, Charlotte Provensa, who both testified that the child had a propensity for hiding and particularly liked to hide in that closet. There is no evidence in the record to contradict defendant's explanation that he first went to the exits leading outside to look for the child before he checked the closet; in fact, the child's grandmother admitted that it was possible that the defendant was looking for the child at the same time that she was.
*216 Marguerite Baronne testified that she did not notice anything unusual or alarming when the child and the defendant exited the closet. The child's grandmother testified that the child was fully clothed and was not crying or acting unusual after he came out of the closet. The circumstantial evidence of the closet incident presented by the prosecution fails to exclude the very reasonable explanation that the child was hiding and that the defendant found him in the closet and brought him out into the classroom.
Therefore, the prosecution's case hinges on the testimony of the child. Simply because the child's testimony tends to support each fact necessary to constitute the crime charged, we may not disregard our duty under due process of law as interpreted by Jackson v. Virginia. State v. Mussall, 523 So.2d at 1311.
The child was four years old at the time of the alleged abuse. Criminal proceedings were instigated against the defendant by the child's mother and grandmother who reported their suspicions to a friend affiliated with the police department. Following the defendant's arrest, the child was confronted and questioned about the alleged abuse to which he first responded by shaking his head vigorously and emphatically and repeatedly said nothing. Some eight or nine months later, when questioned again, he was still reluctant verbally to recount information regarding the alleged abuse. During the two years that elapsed prior to trial, he was counseled, in private, by members of the District Attorney's office. The child's mother testified that at least two of these visits to the District Attorney's office occurred during the weeks prior to trial. By the time of the trial, the child was six years old. His testimony consisted of one-word (i.e., yes, no) answers to very specific leading questions. Essentially, the only incriminating testimony elicited from the child at trial was that the defendant touched the child in the "wrong place," which the child designated, by gesturing to his genitals.
Given this record, we conclude that any rational trier of fact, viewing the evidence as favorably to the prosecution as a rational fact finder can, must have a reasonable doubt as to the defendant's guilt. We find the decision of the jury to convict this defendant based on the evidence presented irrational and unsupported, and, accordingly, we reverse.
REVERSED.
NOTES
[1] Dr. Taylor testified that he did not see the family again until about four or five months later. However, our review of the record indicates that at least an eight-month period had elapsed.
[2] The record reflects that defendant, Brian Bruce, was generally also known and referred to by the students, parents, and teachers at the Foundation as "B.B." or "Mr. B.B."
[3] The record also contains the testimony of three clinical psychologists, however, as discussed earlier, their testimony was wholly inconclusive as to whether sexual abuse had in fact occurred.