529 So.2d 845 (1988)
STATE of Louisiana
v.
Clarion BAY, Jr.
No. 87-KA-1790.
Supreme Court of Louisiana.
May 23, 1988.
Rehearing Denied September 8, 1988.
*846 William J. Guste, Jr., Atty. Gen., Don. M. Burkett, Dist. Atty., Elizabeth A. Pickett, Asst. Dist. Atty., for plaintiff-appellee.
Joseph D. Toups, Jr., Baton Rouge, Steve Thomas, Mansfield, Herbert V. Larson, Jr., New Orleans, for defendant-appellant.
COLE, Justice.
Defendant, Clarion Bay, Jr., was convicted of first degree murder and sentenced to death. He appeals, having designated, as provided for in La.C.Cr.P. art. 844(A), six errors to be urged on appeal. Of these six assignments of error, he has briefed only three. In oral argument defendant's attorney stated the three unargued assignments were deleted and had been abandoned. Of the three assignments which were briefed and argued, two relate to the sentencing phase of the bifurcated trial and the other complains there is insufficient evidence in the record to support the conviction itself.
We find merit in defendant's argument that there is insufficient evidence to support a conviction for first degree murder. We do find, however, there is sufficient evidence in the record to support a conviction for second degree murder. In this posture, it is unnecessary to consider the two briefed assignments of error pertaining to the sentencing phase of the trial. The issue then arises as to whether this Court should consider the merits of the three unargued assignments of error or whether we should consider those assignments as abandoned. For the reasons discussed below, we hold the three unargued and unbriefed assignments of error will be considered as abandoned. Thus, having found the evidence sufficient to support the lesser and included crime of second degree murder, we remand for entry of judgment of guilty of second degree murder with the appropriate sentence.[1]

FACTS
On August 17, 1982, a partially decomposed body was found in a wooded tract about 30 feet off a dirt logging trail near Florien, a small town near Many, Louisiana. Aside from a silver cigarette case embossed with a cow's head and horns and containing a BIC lighter, there was nothing to identify the individual. The body itself was in several pieces, having been scattered by small animals. The remains were gathered and sent to Dr. George M. McCormick, a forensic pathologist. Following an autopsy and thorough comparison of dental and medical records furnished by the authorities, Dr. McCormick identified the decedent as Essex Lynn Fogle. As to cause of death, Fogle's shirt was peppered with holes; pellets and paper wadding were recovered from the chest and abdomen areas; and, fracturing and gouging of a thoracic vertebra near the waistline were observed. This led Dr. McCormick to conclude Fogle had been killed by a shotgun blast to the back at "fairly close" range, possibly at a distance of "a few feet." Given the condition of the body, it was impossible to pinpoint the precise date of death. In Dr. McCormick's opinion, between the elements and the animals, "extensive decomposition" would have occurred within ten days to two weeks. Death could have occurred, therefore, anytime between the end of July and about the 5th of August. Subsequent analysis by the Crime Lab determined the pellets and waddings were from No. 1 buckshot shells, fired either from a 12 or 16 gauge shotgun.
Essex "Stovepipe" Fogle had been released from Louisiana Correctional and Industrial School in DeQuincy on February 8, 1982, after earning good-time release from a two year term for felony theft. Records from LCIS helped identify the body and were introduced at trial. Prior to his death Fogle lived in the "Crossing" section of *847 Leesville, an area known for its bars, motels and prostitution. It had been Fogle's habit to gather every day with other men under a big shade tree on Havana Street. Two men who usually joined the crowd were Lonnie Stewart and Edward Bouya. At some point, Fogle stopped showing up. Although neither Steward nor Bouya could be positive as to precisely when this occurred, both men were sure Fogle was in the company of defendant, Clarion Bay, Jr., the last time they saw him.
Bay also lived in the area and was often at the Havana Street meeting place. According to Stewart, he last saw Fogle at a time when Bay said he was going to take Fogle to see some girls in Many, an arrangement with which Fogle agreed. Bouya last saw Fogle as a passenger in a car driven by defendant. As the car passed Bouya, Fogle hollered out the window, "I'm going to Many to fuck with the pretty whores."
Authorities learned that on either the third or the fourth of August defendant brought a shotgun into Marlin Kirkland's Leesville store. Defendant, a regular customer, wanted ammunition but was unsure what type the gun required. According to Kirkland, the weapon defendant carried was a 16 gauge single-shot shotgun. Kirkland sold defendant a package of five No. 1 buckshot shells. From Clarise Marie White, defendant's girlfriend and the mother of his child, authorities learned that on or about August 8, defendant told her he had shot and killed a man and dumped the body in some woods. When White did not believe him, he drove a few miles out of Florien and parked. After leaving to check whether "it's still there," defendant returned to the car and then led White into the woods. White only saw "something green," but "smelled something [terrible]." Back in the car defendant told her "it wasn't nothing but a cow [he had shown her]." However, defendant subsequently told White he had killed the man because he was a "snitch" and "[b]ecause he was paid to" by one "Missy or Mary Johnson." On another occasion, defendant told White and White's sister-in-law (Cynthia Moore) he and two other men shot and killed a man. Defendant related he shot the man in the head and the second man also shot the victim while the third man struck the victim over the head with a tire iron. Defendant identified his co-participants in the crime, variously, as Donald Richardson and Murphy Ford, and, as Scooby Blue and Bobby Blue.
According to Cynthia Moore, defendant told her he had killed Fogle. She also heard him say "that's what happens to snitches." Defendant elaborated by saying, "they be found with maggots in them." Defendant said two men helped with the killing and identified the co-participants both as Richardson and Ford, and as Scooby Blue and Bobby Blue. Like White, Moore indicated defendant had been joking when he made these statements. Moore, too, confirmed that "Bobby Blue" and "Scooby Blue" were ficticious names.
Defendant made other inculpatory remarks to one James L. Sullivan. According to Sullivan, while he and defendant were in the home of Haywood Franks, the telephone rang. Franks answered it and began talking. Based on Franks' side of the conversation, Sullivan asked defendant what the call was about. Defendant told him it was about "a killing that he had done" for the man Franks was talking to. There had been a problem over "some dope and ... money transactions" and when the victim failed to pay for the drugs, defendant killed him. On another occasion, and in response to Sullivan's request for a gun, defendant told him he would have to check with Franks because his gun had been used in a murder. Defendant also told Sullivan he had shot a man in the face with a shotgun and had dumped the body in some bushes near Many. Defendant said the man was a snitch and, further, that the body had nearly deteriorated before being discovered.
Investigators arranged for White to retrace for them the route taken by defendant through Florien. She directed two officers through the town, to Prospect Road and then to a point in some woods off a *848 logging trail. The spot was precisely where Fogle's body had been discovered.
After giving a statement in which he denied any complicity in the crime, defendant was arrested. The matter was presented to the grand jury but that body pretermitted the case. In March of 1985, the case was submitted to a second grand jury with the result that defendant was indicted for the first degree murder of Essex "Stovepipe" Fogle.

TRIAL POSTURE
Trial commenced May 19, 1986. The state's theory of the case, outlined in its opening statement, was that defendant lured Fogle from Leesville on the pretext of chasing women in Many. Outside Florien, defendant stopped his car and he and Fogle walked into the woods. There, defendant shot Fogle in the back with a 16 gauge shotgun, "inflicting immediate death." Defendant robbed him and left the body in the woods. The state also argued defendant had been offered or received something of value for the crime. Jurors were told the case was not about "the person who allegedly paid the money." Instead, the panel was told to concentrate on the evidence against defendant and not to become
confused by issues that don't have anything to do with your decision. You don't have to decide who paid the money. You don't have to decide why the money was paid. All you have to determine is that [defendant] killed [Fogle], and he did it in exchange for something of value and/or he also did it and robbed him at the time he killed him. That's the two... things you have to decide and that's all.
Thus, the state asserted the homicide was first degree murder by virtue of defendant's specific intent and because the killing was done either during the commission of an armed robbery or in a murder-for-hire scheme. La.R.S. 14:30(1), (4).[2] However, the state adduced no evidence to establish or tending to establish the commission of an armed robbery. While the prosecutor urged jurors during closing arguments to make such a finding, evidence in support of this element of the offense was simply non-existent. In oral argument before this Court the state admitted there was no evidence of a robbery.
Without evidence to show an armed robbery, the state's case for first degree murder hinged upon proving the other aggravating factor asserted, i.e., that defendant had been offered or received something of value for killing Fogle. The state relied exclusively on the testimony of Clarise White and James Sullivan to prove a murder-for-hire, the latter denying it was he who paid defendant to kill Fogle.
During its case-in-chief, the defense called Haywood Franks who denied a conversation of the kind Sullivan described ever occurred. The witness also denied discussing murder or a killing during Sullivan's three visits to his home. The witness had allegedly received a $96,000 settlement for an on-the-job injury, but had little of it left. He acknowledged a prior drug conviction. Franks did not know the victim.
The defense also produced a string of witnesses who served time with Sullivan. These testified uniformly that Sullivan told them he knew nothing about the murder but was being threatened with a ten-year sentence on charges pending unless he agreed to testify against defendant.
*849 The defense's final witness was Vernon Parish Deputy Archie Martin who testified defendant provided the tip and helped to arrange Sullivan's apprehension in Leesville as a fugitive from Texas.
Defendant did not take the stand during the guilt phase of trial. Jurors deliberated one hour and 55 minutes and unanimously found defendant guilty as charged.

SUFFICIENCY OF THE EVIDENCE
In an assignment of error which is briefed, defendant challenges the sufficiency of evidence in support of his conviction for first degree murder. He also contends the evidence does not support conviction for any grade of homicide. Regarding the offense of first degree murder, defendant challenges as insufficient the evidence underpinning the two aggravating factors relied on by the state. As already noted above, we agree with defendant there was no evidence of robbery, a fact conceded by the state in oral argument. The conviction for first degree murder can only stand on evidence of murder-for-hire.
As regards the murder-for-hire scheme, defendant challenges the testimony of James Sullivan as "incredible." He argues it was unreasonable to believe he would have discussed a murder with Sullivan on less than two months' acquaintance. Defendant reasons if such a conversation did occur, and if Sullivan related it accurately, his statements only suggested he killed over a drug deal gone awry. Since Sullivan gave no testimony with respect to money or anything of value being offered or received by defendant, the only inference which could be drawn is that defendant admitted a killing. Defendant contends that while damning in the extreme, this does not amount to proof a murder-for-hire took place. He maintains Sullivan's testimony does not exclude any number of other motives, other than a murder-for-hire, to explain the killing. For example, defendant may have killed as a favor to Franks' caller, or to ingratiate himself with the man. Perhaps, defendant killed because he personally was disadvantaged by the victim's failure to pay for the drugs. In any event, Sullivan's testimony, defendant urges, did not establish defendant was hired to do a killing.
The only other witness to offer evidence on point was Clarise White. White often testified by nods of her head and had to be cautioned repeatedly to speak up. Her vague and gap-filled testimony was supplemented by information supplied via the prosecutor's questions. In defendant's view, White's demeanor and performance on the stand was "[w]retched." Defendant claims even conceding White accurately related defendant's statements, his employer was a woman, "Missy or Mary Johnson," who "paid" defendant an unknown amount of money which White never saw. Defendant argues this witness' vague details about a murder-for-hire scheme was insufficient, standing alone, to permit a rational fact-finder to find a murder-for-hire beyond a reasonable doubt. For these reasons defendant asks that we set aside the verdict and enter judgment of acquittal on the charge of first degree murder.
Defendant also asserts the evidence was insufficient to support any grade of homicide. It is suggested the testimony of Stewart and Bouya is of no value, given the inability to pinpoint the date of death and the witnesses' inability to state with precision when they last saw Fogle.[3] It is argued defendant's purchase of the shotgun shells establishes only that defendant, "like every other individual who had ever purchased 16 gauge shotgun shells, could have been responsible for the death of Essex *850 Fogle." As for defendant's statements to White, Moore and Sullivan, defendant argues these witnesses are simply unbelievable.

* * * * * *
Considering all of the above, we find there was sufficient evidence from which a rational factfinder could have concluded defendant committed a specific intent homicide.
Implicit in defendant's statements to White, Moore, and Sullivan are several persistent themes from which a coherent case is woven. One is he killed a man because the victim was a "snitch." According to police testimony, Fogle had the reputation of being a "snitch." While defendant never identified the victim to White or Sullivan, he did to Cynthia Moore.
Another theme relates to the scene of the crime. To each of these witnesses defendant indicated the murder occurred in a sufficiently out-of-the way spot to allow "maggots" and other evidence of decomposition to become manifest.
A third theme was the manner of death. Although garnished in various ways, defendant consistently told the witnesses the victim was shot. Other evidence established that defendant was in possession of the type of gun used to kill Fogle and that he purchased ammunition of the type used. However, the final proof of defendant's guilty knowledge lies in his taking White to the scene of the crime.
Under these facts a rational jury could have concluded defendant specifically intended to, and did in fact, kill Essex Fogle. This equates to second degree murder. R.S. 14:30.1. Defense contentions to the contrary are not persuasive.
Evidence that he did so in a murder-for-hire scheme is far more problematic and, in fact, rests exclusively on this portion of Clarise White's testimony:
Are you telling the same thing today that you told to me and Trooper Parker last week?
Yes, sir.
And the same thing you told to the police back in '83?
Yes, sir.
Did Clarion ever tell you why he wanted to kill this guy?
He was supposed to have been a snitch to the police.
Who was supposed to have been a snitch to the police?
This guy.
Stovepipe?
Um-hum (nodding head)
All right, why did he kill him though?
Because he was paid to.
Did he tell you who paid him to do it?
Ahh
THE COURT: Speak up, Ms. White.
Missy, Mary Johnson, something like that.
Okay. Did you ever see the money
THE COURT: Excuse me. Ask that question again, Mr. Burkett, and have the witness repeat the answer. A couple of the jurors didn't hear her.
Did he tell you who paid him to do that?
Missy or Mary Johnson, something like that.
Missy or Mary Johnson?
Um-hum (nodding head)
Did you ever see the money?
No, sir.
Did he tell you how much he was paid to do it?
No, sir.
He told you this guy was a snitch though, is that correct?
Yes, sir.
Are you sure about that?
Yes, sir.
The state neither produced Missy/Mary Johnson nor did it adduce any evidence to corroborate White's testimony. There was no evidence, for example, to show defendant had been seen with large amounts of money. There was nothing to show he made unusual or expensive purchases. No bank records or financial information were produced. And, there was nothing to show defendant's life style, standard of living or habits changed in any way around the time of Fogle's death.
*851 Were we to assume White's demeanor on the stand made a far better impression than the cold transcript would suggest, and further assume jurors found the witness entirely credible; when viewed in the light most favorable to the prosecution, White's testimony standing alone is too insubstantial to establish beyond a reasonable doubt defendant had been offered or received something of value for killing Fogle. No rational fact-finder could have found otherwise. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Mussall, 523 So.2d 1305 (La.1988).
As previously noted, defendant's complaints addressing insufficiency of evidence to support conviction for first degree murder have merit. There was no way for the defendant's jury, as rational fact-finders, to determine which one of three scenarios given of Fogle's death by the defendant was reliable. The jury had before it projections of Mary Johnson, Scooby and Bobby Blue, and Haywood Franks. Only one scenario supported a conviction for first degree murder. As set forth above, the prosecutor himself thought the Franks scenario, as related by Sullivan, appeared more likely than the Missy or Mary Johnson account. However, even that version of Fogle's death proved the defendant guilty only of second degree murder. In fact, the only conclusion a rational fact-finder could reliably draw from the evidence at trial is that defendant shot Fogle with the specific intent to kill him, which would support a conviction of second degree murder.[4]

THE UNBRIEFED ASSIGNMENTS OF ERROR
It has long been the general rule of this Court that in criminal cases assignments of error neither briefed nor argued are considered abandoned or waived. See, e.g., State v. Kirkpatrick, 443 So.2d 546 (La.1983); State v. Jones, 340 So.2d 563 (La.1976); State v. Mills, 229 La. 758, 86 So.2d 895 (1956); State v. Hendon, 170 La. 488, 128 So. 286 (1930). See, also, Rule 7, Section 6, Louisiana Supreme Court Rules. In death penalty cases, however, we apply an exception to the general rule and review, as a matter of policy, assignments of error even if unbriefed. See, e.g., Kirkpatrick, supra; State v. Lowenfield, 495 So.2d 1245 (La.1985); State v. Lindsey, 404 So.2d 466 (La.1981); State v. Jones, 332 So.2d 466 (La.1976). A thorough review of the jurisprudence reveals these rules have been consistently applied, but the underlying policies which engendered the rules have never been fully delineated. The circumstances of this case, however, present us with the need to consider more carefully the policies underlying the jurisprudential rule. In particular, the question of when to apply the "death case exception" is thrust upon us. The issue is thrust upon us because we have found one of defendant's briefed assignments to have merit, with the result that the first degree murder charge cannot stand.
In this case the defendant no longer faces the death penalty. Under this circumstance, should the death case exception to the general rule as regards abandonment of assigned error still be applied? We believe it should not. Instead, we hold where a defendant has been sentenced to death, but an error which has been argued or which is patent on the record mandates a reduction of the grade of offense so that the defendant no longer faces the death penalty, then the general rule that unbriefed and unargued assignments of error are considered abandoned will be applied.
The general rule applying to unbriefed and unargued assignments of error is justified in that it is a fair assumption that a litigant has waived any assignment he chooses not to brief and argue. Moreover, without any argument or citation of authorities, the Court has little or no indication of why the assignment represents an error. It is not the role of the court, nor does it have the time, to develop a viable argument for an assignment of error which a litigant does not feel important enough to brief and argue. If an error is not patent, i.e., discoverable by a review of the pleadings *852 and proceedings without inspection of the evidence, then the party urging it should brief and argue the reasons why he assigned it as error.[5]
On the other hand, it is just as readily apparent why this Court has excepted from the general rule the situation where a defendant faces the death penalty. As a matter of policy, we are not inclined to affirm a sentence of death where an error has been assigned without first concluding the assignment has no merit. The potential deprivation of life warrants that we make the extra effort to review the record and see if we can develop a viable argument for the defendant even if the defendant fails to do so himself. Special consideration should be afforded before a life is taken.
We hold the policy considerations warranting the exception do not apply once the potential for a deprivation of life is removed. Rather, once that happens, the general rule should apply to the case.[6]

DECREE
For the reasons assigned we set aside the conviction and sentence and remand for entry of judgment of guilty of second degree murder and sentencing of defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence as provided for in La.R.S. 14:30.1.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
I agree that the conviction of first degree murder must be set aside because of the insufficiency of the evidence of an essential element of the crime. I also agree that the evidence was sufficient to support a conviction of the responsive offense of second degree murder.
Normally, we would next proceed to review assignments of trial error to determine whether there is any error which requires reversal and remand for a new trial or whether a judgment of conviction of the responsive offense should be entered. I am not satisfied to decline to review an error, which was listed in the assignments of error filed in the trial court, by simply relying on a procedural rule which considers unargued errors as abandoned. Rather, in a case in which an unargued error has come to our attention (such as through a staff memorandum or through review by the writing judge), I believe we should inquire into the nature of the error and its effect on a subsequent contention of ineffective assistance of counsel.
Here, any error in refusing a challenge for cause of a prospective juror who did not serve on the jury was not the type of error which "renders the result unreliable".[1] See State v. Hamilton, 478 So.2d 123 (La. 1985), footnote 7; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). Fairness therefore does not require a retrial on the charge of second degree murder, a charge for which defendant has been proved guilty beyond a reasonable doubt without any errors that would affect the integrity of the fact-finding process.
NOTES
[1] When the evidence does not support the conviction, the discharge of the defendant is neither necessary nor proper if the evidence supports a conviction for a lesser and included offense. State v. Byrd, 385 So.2d 248 (La.1980). Rather, the proper procedure is for this Court to remand for entry of a judgment of guilty to a lesser and included offense which is a legislatively authorized responsive verdict. Id.; see also, State v. Jones, 426 So.2d 1323 (La.1983).
[2] At the time of the offense in July/August of 1982, La.R.S. 14:30 (Acts 1979, No. 74, § 1) defined first degree murder as the killing of a human being done under any of the following circumstances:

(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery; * * *
* * * * * *
(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.
* * * * * *
Whoever commits the crime of first degree murder shall be punished by death or life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence in accordance with the recommendation of the jury.
[3] Indeed, neither Stewart nor Bouya testified with any certainty. Stewart, for example, saw Fogle in the middle of a week sometime in August. On cross-examination the witness admitted to having told defense counsel he could not recall the month. Explaining how he could now tell jurors otherwise, Stewart testified that Bouya had "refreshed (his) memory ... (and) told (him) it was in August." From his own recollection, Stewart conceded he "couldn't even really tell you what month it was in." As for Bouya, this witness denied "refreshing" Stewart's testimony and while he could recall it was August, because it was summertime and the kids were out of school, he could not recall the year. The witness explained it was not until he heard the prosecutor say "1982" that he recalled what year he last saw Fogle.
[4] This being so, the proper course for this Court to take is delineated in footnote 1, supra.
[5] Of course, the assigned error may be argued both in brief and orally before the court. Regardless, compliance with Rule 7, Section 6 of the Louisiana Supreme Court Rules is required.
[6] As an aside we note that for the very reasons why we consider unbriefed and unargued assignments of error as abandoned in non-death penalty cases (i.e., because it is not the role of the court, nor can the court afford the time, to develop arguments for the litigant which the litigant fails to present himself), we also consider it appropriate in capital cases to first decide whether the argued assignments of error have merit. Only if we find no error in the argued assignments and no patent error, is it then appropriate for this Court to examine the record and see if it can develop an argument for an assignment the defendant has not argued himself.
[1] The defense attorney apparently realized this on appeal and concentrated his focus on the issues which have now resulted in relieving his client (who is clearly guilty of second degree murder) of the death penalty.