PER CURIAM:
11Writ denied. The Fourth Circuit correctly reversed the district court’s order for a new trial.
In 1995, an Orleans Parish jury found Rogers LaCaze, and separately, co-defendant Antoinette Frank, guilty of three counts of first degree murder for the March 4, 1995 armed robbery and triple homicide of siblings Cuong Vu and Ha Vu, employees of the family-owned Kim Anh Vietnamese restaurant in New Orleans East, and New Orleans Police Officer Ronnie Williams, who was at the time working a paid security detail at the restaurant. Antoinette Frank (“Frank”), herself a New Orleans Police Officer, was Ofc. Williams’s former partner and sometimes also worked security at the restaurant.
*859 After finding LaCaze guilty as charged on all three counts, jurors unanimously voted to impose the death sentence. This Court affirmed his convictions and sentence. State v. LaCaze, 99-0584 (La. 1/25/02), 824 So.2d 1063, cert. denied, LaCaze v. Louisiana, 537 U.S. 865, 123 S.Ct. 263, 154 L.Ed.2d 110 (2002).
IgThe state’s case was premised on the survivors’ identifications of both LaCaze and Frank, in addition to other evidence which showed, inter alia, that after Frank met LaCaze in November 1994, the pair established a routine of acting in concert while Frank was on duty, with LaCaze accompanying her as she responded to calls. Just hours before the murders, the two were seen together at a Wal-Mart store, Frank in full uniform, shopping for the same caliber ammunition that was used to kill all three victims. The state also presented LaCaze’s custodial statements in which he placed himself inside the restaurant during the massacre, albeit while denying he killed anyone.
LaCaze took the stand to repudiate his custodial statements, instead claiming he was at the time with his brother Michael, playing pool at Mr. C’s Pool Hall, an alibi Michael repeated when called to testify. The defense timeline offered at trial, however, was internally inconsistent: LaCaze conceded he was still in Frank’s company when she ordered food from the restaurant, which phone records established occurred at 12:51 a.m., roughly 20 minutes after LaCaze and Michael claimed they were en route to the pool hall. Further, the pool hall’s manager testified unequivocally that Michael had played pool that night loithout his brother.
Ultimately, the jury rejected LaCaze’s defense in which he insisted his inculpato-ry statements were the result of coercion, and instead accepted the state’s theory that, although it appeared the same gun was used to kill all three victims, it was immaterial whether Frank or LaCaze had pulled the trigger because the evidence showed that both were present and specifically intended to kill, and therefore equally guilty as principals.
In 2002 or 2003, LaCaze filed a pro-se shell application for post-conviction relief, followed by a counseled supplement. After protracted delays, the district court conducted a multi-day evidentiary hearing in 2013, at which the parties called over 20 witnesses in total. Nearly two years later, the district court issued a 13128-page ruling addressing LaCaze’s claims in detail and ultimately vacating his convictions and death sentence based on its determination that juror David Settle was seated after he failed to disclose his law enforcement experience during voir dire, an error it found constituted a structural defect warranting a new trial.
The Fourth Circuit granted the state’s writ and reinstated the convictions and death sentence, State v. LaCaze, 15-0891 (La. App. 4 Cir. 1/6/16) (unpub’d), having found the district court “erred in finding that the seating of Mr. Settle on [the] jury was a structural error entitling him to a new trial,” and that the district court had not erred in dismissing the remaining claims.
As a result of LaCaze’s failure to file a writ application in the Fourth Circuit, the parties now dispute the scope of the issues before us. As the state sees it, his failure to seek writs in the court below caused the district court’s ruling as to all remaining claims to become final and no longer subject to review. However, this Court has recognized that a “party who does not seek modification, revision, or reversal of a judgment” may “in an appellate court, including the supreme court,” assert in support of that judgment any argument for which the record contains support “al *860 though he has not appealed, answered the appeal, or applied for supervisory writs.” State v. Butler, 12-2359, pp. 4-5 (La. 5/17/13), 117 So.3d 87, 89 (emphasis added) (citing La.C.C.P. art. 2133(B)). Although LaCaze did not file a cross-application below, he did file an opposition in which he re-urged claims the district court dismissed as alternate grounds for upholding the order for a new trial, and thereby preserved those claims, as contemplated in Butler. In any event, considering the need for heightened scrutiny in capital penalty proceedings, see Gilmore v. Taylor, 508 U.S. 333, 342, 113 S.Ct. 2112, 2117, 124 L.Ed.2d 306 (1993), we have considered whether exercise of our supervisory jurisdiction is warranted in light of any claim now raised and upon which the district court passed judgment.
|4The district court vacated LaCaze’s convictions and death sentence based exclusively on the seating of juror David Settle. LaCaze urges the district court correctly ordered a new trial as a result of Mr. Settle’s presence on the jury because Mr. Settle failed to respond during voir dire when asked whether any panelists were related to anyone in law enforcement, although he had a history of law enforcement experience and other venire members disclosed their connections to law enforcement personnel. Specifically, LaCaze asserts he has discovered post-conviction that Mr. Settle’s employment history includes past service as a police officer for railroad companies in other states and that, at the time of LaCaze’s trial, he was “a Field Officer for the Louisiana State Police.”
The district court credited the argument, finding “simply no excuse” for Mr. Settle’s failure to respond when his panel of prospective jurors was asked if anyone was related to someone in law enforcement, especially after fellow panelists volunteered their more tenuous connections. The district court determined that Mr. Settle was a “badge-wearing law enforcement officer” who, but for his failure to respond, would have been subject to a meritorious challenge for cause, citing State v. Simmons, 390 So.2d 1317 (La. 1980), and therefore found his inclusion on the jury a structural error which prevented the verdicts from being rendered by an impartial jury.
As the Fourth Circuit determined, the district court erred in this regard. Louisiana law is settled that there is no per se bar to law enforcement personnel serving as jurors. Although at the time of trial, our jurisprudence provided that the guarantee of a fair trial “is offended by the presence on a jury of a badge-wearing law enforcement officer,” Simmons, 390 So.2d at 1318, courts interpreting Simmons construed it narrowly and carved out exceptions for law enforcement personnel not actively engaged in making arrests. See, e.g., State v. Valentine, 464 So.2d 1091, 1095 (La. App. 1 Cir. 1985), writ denied, 468 So.2d 572 (La. 1985) (DQC correctional officer not incompetent to serve although she also had four first cousins who worked for the sheriff); State v. Henderson, 566 So.2d 1098, 1103-04 (La. App. 2 Cir. 1990) (field sergeant at Wade Correctional Institute competent to serve). Further, as even the district court acknowledged, while LaCaze’s appeal was pending, this Court overturned Simmons, reasoning that because law enforcement officers are sworn to uphold the law, including the guarantee of a fair trial, a district judge has discretion to determine whether an officer is speaking the truth when he states under oath that he can remain fair and impartial. State v. Ballard, 98-2198 (La. 10/19/99), 747 So.2d 1077, 1079. Thus, the Simmons ban does not apply, given that it was overruled it while *861 LaCaze’s appeal was pending. See Griffith v. Kentucky, 479 U.S. 314, 828, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) (“... [A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a ‘clear break’ with the past.”).
Even assuming arguendo that Simmons did apply, Mr. Settle would not have been subject to a meritorious challenge for cause. LaCaze maintains Mr. Settle was an “active duty officer,” but has put forth no evidence that he was at the time of trial the sort of badge-wearing officer Simmons deemed unfit for jury service. Instead, La-Caze has shown that although Mr. Settle was previously a police officer in other states with patrols limited to railroad property, when he was selected as a juror in this case he was working for the Bureau of Motor Vehicles mthout arrest powers— in an apparent desk position. Mr. Settle testified at the post-conviction hearing that “he was ‘not a field officer’ at the time of LaCaze’s trial, that he ‘[did not] have 'arrest powers,’ and that his job was to ‘clear up driver’s license for people under suspicion.” Such circumstances hardly give rise to the sort of bias that disqualified the juror in Simmons. See Simmons, 390 So.2d at 1318 (juror with ^graduate degree in law enforcement who was employed by sheriffs office and working closely with the district attorney’s office, must have been affected by her employment to an extent that would influence her verdict).
Even having acknowledged that Simmons was overturned before LaCaze’s convictions' and sentences were affirmed, the district court found Mr. Settle’s presence on the jury a reversible error because his non-disclosures precluded the parties from exploring whether his employment experience would affect his deliberations.[1] For.the following reasons, this view is untenable.
The United States Supreme Court has found that a petitioner who collaterally attacks his conviction based on alleged juror dishonesty during voir dire must demonstrate (1) that the juror failed to honestly answer a material question and (2) that a correct response would have provided a meritorious basis for a challenge for cause. McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556, 104 S.Ct. 845, 860, 78 L.Ed.2d 663 (1984). Under La.C.Cr.P. art. 797, the grounds for challenging a prospective juror for cause include, inter alia, that the “juror is not impartial, whatever the cause of his partiality,” or that he has a “relationship, whether by blood, marriage, employment, friendship, or enmity” with persons involved in the case “such that it is reasonable to conclude that it would influence the juror in arriving at a verdict.” Applying McDonough, the 10th Circuit has explained the standard as requiring that:
A party who seeks a new trial because of non-disclosure by a juror during voir dire must show actual bias, either by *862 express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.
Burton v. Johnson, 948 F.2d 1150, 1156 (10th Cir. 1991) (citations and quotations omitted).
Thus, in addition to showing that Mr. Settle failed to honestly answer a material question, LaCaze must also show that he harbored actual bias, or at least point to specific facts from which bias must be presumed. For example, in Williams v. Taylor, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), another post-conviction capital case, the Supreme Court remanded for an evidentiary hearing based on allegations that a juror concealed relationships with a prosecution witness and the prosecutor — and that prosecutor was so aware but stood mute. On remand, the district court found the juror intentionally misled the court and granted relief. Williams v. Netherland, 181 F.Supp.2d 604 (E.D. Va.), aff'd, 39 Fed.Appx. 830 (4th Cir. 2002) (unpub’d). In Burton, supra, the defendant obtained relief because issues of domestic abuse were central to the case and a juror failed to disclose her own experiences as a victim of similar abuse, yet later discussed it with other jurors. Similarly, in United States v. Scott, 854 F.2d 697 (5th Cir. 1988), the Fifth Circuit reversed the defendant’s convictions because a juror failed to disclose that his brother was a deputy sheriff in an office involved in the case.
Here, Mr. Settle testified as a post-conviction witness and, as LaCaze urges, his testimony detailing his own law enforcement experience indicates he had good reason to respond when his voir dire panel was asked whether they had any such connections. However, as the state urges, it is not clear that his lack of candor can be fairly characterized as outright dishonesty: the only indication he may have been questioned about his own experience is a truncated query in which the trial judge asked those in the second row if any were “involved or know anybody in law enforcement? — any close personal friends or anything like that?”, and it appears Mr. Settle was not seated in the second row. Nevertheless, because several ^questions were aimed at whether panelists had any connections with law enforcement, the inquiries were sufficient to have prompted a reasonable person in Mr. Settle’s position to disclose his employment experience.
However, even assuming Mr. Settle failed to honestly answer a material question, thereby satisfying McDonough’s first prong, LaCaze has not shown that he would have been subject to a meritorious challenge for cause. See Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (“[E]ven an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality.”). The avenue to resolve allegations of concealed juror bias is to conduct a hearing at which a defendant has the opportunity to prove bias. Burton, 948 F.2d at 1156. LaCaze has been afforded precisely such an opportunity) yet, despite having called Mr. Settle as a post-conviction witness, he has offered neither an express admission of bias from Mr. Settle nor pointed to any specific facts from which Mr. Settle’s bias or partiality must be inferred. Unlike in Williams, 529 U.S. 420, 120 S.Ct. 1479 and Scott, 854 F.2d 697, where jurors concealed relationships with a state witness, a prosecutor, and a sheriffs deputy, and distinguishable from Burton, where a juror failed to disclose her experience as a victim of abuse similar to the abuse at issue, LaCaze neither alleges nor shows that Mr. Settle had any relationships or experience which affected or must be presumed to have affected his view of the evidence in this case. *863 Accordingly, the Fourth Circuit correctly reversed the order for a new trial on this ground.[2]
| sLaCaze’s related claim that trial counsel rendered ineffective assistance during voir dire is also meritless. A petitioner claiming counsel rendered ineffective assistance must show that (1) counsel erred and (2) the error rendered the proceedings unfair and the conviction suspect. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel’s decisions during voir dire lie at the core of trial strategy, see generally Nguyen v. Reynolds, 131 F.3d 1340, 1349 (10th Cir. 1997) (“An attorney’s actions during voir dire are considered to be matters of trial strategy.”) (citing Teague v. Scott, 60 F.3d 1167, 1172 (5th Cir. 1995)), and even assuming counsel’s voir dire questions should have been more searching, because LaCaze has not shown that any seated juror would have been subject to a meritorious challenge for cause, he has not shown that counsel’s performance rendered the proceedings fundamentally unfair or his convictions suspect. The district court correctly rejected this claim.
LaCaze next asserts he is entitled to relief because Judge Marullo presided over trial despite an appearance of impropriety. LaCaze asserts recusal was necessary in light of information adduced at co-defendant Frank’s subsequent trial; specifically, that months before the murders, Frank, then a New Orleans Police Officer, obtained — pursuant to a release purportedly signed by Judge Marullo — a 9 mm Beretta semi-automatic handgun from the NOPD Evidence and Property |inRoom. That weapon, which Frank reported stolen before the murders, was of the same caliber and perhaps the same gun used to kill the victims. As LaCaze sees it, Judge Ma-rullo’s failure to disclose that he was questioned in an internal police investigation as *864 to how Frank obtained the weapon obstructed his ability to make an informed decision about moving for recusal.[3]
It is well-settled that a judge is presumed impartial. State v. Edwards, 420 So.2d 663, 673 (La. 1982). La.C.Cr.P. art. 671(A) lists the grounds for recusal in a criminal case, providing in part that a judge shall be recused if he is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial or “would be unable for any other reason, to conduct a fair and impartial trial.” The latter catch-all includes circumstances which clearly indicate the judge cannot remain impartial, although no specified ground for recusal exists. La.C.Cr.P.art. 671, Cmt. The code article thus underscores a judge’s duty to avoid even the appearance of impropriety. See State v. LeBlanc, 367 So.2d 335, 341 (La. 1979) (“[E]ven the appearance of impartiality, as well as impartiality itself, outweighs the inconvenience caused by recusal of the trial judge.”) (citing State v. Lemelle, 353 So.2d 1312 (La. 1977)).
A review of the parties’ competing views shows that even if Judge Marullo had disclosed his possible connection with the weapon’s release to Frank — and thereby led LaCaze to move for his recusal on that basis — LaCaze has pointed to no evidence that the judge harbored any bias, prejudice, or personal interest in the case, let alone to such an extent that it rendered him unable to conduct a fair trial. As a post-conviction witness, Judge Marullo emphatically denied any bias on his part. Further, LaCaze fails to show “any other reason” why Judge Marullo was | nunable to conduct a fair trial. La.C.Cr.P. art. 671(A)(6). The suggestion that he became entangled in the facts at issue, purely because he was possibly involved in an administrative release of a weapon that may have been later used to commit the crimes, is baseless and hardly sufficient to rebut the presumption of impartiality.
There has been considerable inquiry, to no avail, as to whether the signature is genuine. Even assuming it is, meaning Judge Marullo in fact authorized the weapon’s release to Frank — a practice which for all that appears was routine, subject to established NOPD procedures — none of the issues in dispute at trial pertained to the means by which the murder weapon was procured. Whether months earlier Judge Marullo approved the release has no bearing on the evidence indicating LaCaze killed Ofc. Williams while Frank gathered the others in the kitchen and that both co-defendants were equally guilty under the law of principals. LaCaze, 99-0584, p. 10, 824 So.2d at 1071-72. As the district court put it, whether Frank obtained the murder weapon “pursuant to a bogus court order” is “immaterial and irrelevant since it did not address any issue that needed to be proved in the case nor did it have a tendency to make the existence of any fact of consequence [] more or less probable.”
LaCaze next claims his convictions were secured by the suppression of evidence and the presentation of misleading testimony. Specifically, he claims the state had a duty to disclose that Frank obtained a 9 mm Beretta from NOPD evidence, as discussed above; that her brother, Adam Frank (“Adam”), possessed motive because he often spent time at the restaurant until *865 he was banned for making unwanted advances toward an employee; that Adam was at one point a person of interest; and that survivor Chau Vu did not, contrary to her trial testimony, see LaCaze during the shooting.
According to the rule in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963) and its progeny, the state’s failure to disclose | t2evidence violates due process only if the withheld evidence is exculpatory or fit for impeachment use and is material to guilt or punishment. As discussed in connection with the claim that Judge Marullo was subject to recusal, any evidence pertaining to the release of the likely murder weapon in no way exculpates LaCaze. He makes the dubious contention that any evidence indicating it was Frank who obtained the murder weapon would have contradicted the state’s theory that he was the dominant party. However, evidence that his accomplice obtained the same type of gun that was used to kill the victims, in a case in which the state presented evidence that he and Frank had been acting in concert under the guise of her authority and together premeditated[4] the murders and were equally culpable, would have only supported the state’s theory and was therefore not subject to disclosure.[5]
Evidence that Adam harbored ill will toward the restaurant employees and Ofc. Williams — because he had been banned from the premises — and that Adam was at some point a person of interest is insufficient to undermine the verdict in a case in which the state presented substantial evidence of LaCaze’s guilt, including, notably, his own custodial statement acknowledging his presence inside the restaurant during the murders and relating details only a perpetrator could have known that early in the investigation. LaCaze has not pointed to any evidence indicating Adam was involved which the state possessed but failed to disclose. | ^Accordingly, he fails to show that, without the information about Adam, he received an unfair trial or a verdict not worthy of confidence. See Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (“The question is ... whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.”).
LaCaze also fails to show the state suppressed anything of impeachment value by withholding Chau Vu’s initial statement. As LaCaze tells it, immediately after the *866 shootings Chau told police, contrary to her trial testimony, that she did not see La-Caze during the shooting. LaCaze claims he should have been able to impeach Chau with this prior inconsistent statement, which he presumably would have urged was more likely accurate than her testimony positively identifying him, given its temporal proximity to the crimes. As the district court found, however, contrary to LaCaze’s characterization, Chau did not tell officers that she did not see LaCaze during the crimes. Rather, her initial statement was consistent with her trial testimony: in her statement she described the male perpetrator as a short African-American whom she met earlier that evening— introduced to her and other employees as Frank’s “nephew.” The state had no duty to disclose this initial statement because nothing therein contradicts her trial testimony in which she positively identified La-Caze as Frank’s accomplice.
LaCaze’s claim that the state suborned perjury is similarly without merit. He asserts prosecutors possessed a duty to correct Ofc. Stanley Morlier’s misleading testimony when the defense called him as a witness in an effort to depict Adam as a likely alternate suspect. LaCaze claims Ofc. Morlier misled jurors when, in response to a line of questioning aimed at showing Adam and Frank harbored ill will after Adam was banned from the restaurant (a directive which was apparently carried out with Ofc. Williams’s enforcement), Ofc. Morlier testified that he never witnessed Frank threaten to kill Ofc. Williams within Ofc. Williams’s presence.
|14As the district court found, although the state possesses a duty to correct false or misleading testimony, see Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),[6] a petitioner is only entitled to relief on that basis if the testimony “could ... in any reasonable likelihood have affected the judgment of the jury .... ” Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959)). Even assuming Ofc. Morlier’s testimony created a false impression that Frank never threatened Ofc. Williams — when in fact there was evidence she had, outside his presence — LaCaze fails show the testimony was reasonably likely to affect the jury’s judgment in a case in which there was no dispute as to Frank’s involvement (the party who either threatened Ofc. Williams or not) and there existed no evidence to connect Adam to the murders. Cf. United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968) (“We do not, however, automatically require a new trial whenever ‘a combing of the prosecutors’ files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict ....’); see also State v. Schilling, 92-3312 (La. 4/13/94), 637 So.2d 459 (denying relief to inmate who showed important state witness lied about agreement to dismiss pending charges in return for testimony because “given other evidence against him, there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial.”). The district court correctly dismissed this claim.
*867 LaCaze next claims trial counsel, Mr. Willie Turk, rendered ineffective assistance.[7] He asserts counsel was woefully unprepared, it being his first capital | atrial, and that his deficient performance “pervaded the proceedings.” He claims the Fourth Circuit erred when it refused to leave intact the district court’s order for a new trial in light of counsel’s errors, so numerous were they, he asserts, that post-conviction counsel has opted herein to present them by way of a numbered list, rather than with supporting discussion. Instead of advancing specific arguments as to why each alleged error rendered the proceedings unfair, see Strickland, swpra, post-conviction counsel offers a general proposition that the jury was deprived of a “wealth of evidence” as a result of trial counsel’s omissions.
Among the listed errors is that counsel failed to call Peter Williams and Angela Walker, whom LaCaze asserts would have supported his alibi by testifying — as his brother Michael did — that he was with them at a pool hall during the shootings. However, LaCaze has failed to address the district court’s finding that a decision not to call these witnesses was reasonable, given that Peter’s account “was incongruent with [LaCaze’s] version of the alibi time-line” and Angela’s was imprecise as to the timing of events.
LaCaze also re-urges that counsel erred by failing to file a motion to suppress the survivors’ identifications, which he claims were obtained by highly suggestive procedures; especially Chau’s identification at the preliminary hearing. Just after the crimes, Chau gave a statement in which she described the male perpetrator (a description consistent with LaCaze’s appearance) and later positively identified LaCaze. This Court can find no logic in the assertion that Chau’s identification should have been excluded as the product of an impermissibly suggestive “show up” merely because she verified her earlier statement at the preliminary hearing while LaCaze was present. As the district court found, “the law does not require attorneys to engage in vain and useless acts” and counsel’s failure to file a motion to suppress on this ground “does not meet the threshold for ineffective assistance of counsel.”
I ir,By merely repeating allegations of counsel error, which the district court provided thorough reasons for rejecting, and absent any convincing argument as to why the district court’s conclusions were flawed, LaCaze fails to show the district court erroneously dismissed these claims. La.C.Cr.P. art. 930.2; see also La.S.Ct.R. X, § 4(3)(d) (requiring “argument of each assignment of error on the facts and the law....”); La.S.Ct.R. VII, § 6 (assignments of error made but not briefed considered abandoned); State v. Bay, 529 So.2d 845, 851 (La. 1988).
Finally, LaCaze claims he is actually innocent and asserts he has made the required showing, as contemplated in State v. Conway, 01-2808 (La. 4/12/02), 816 So.2d 290, 291, with “new material, noncumulative and conclusive evidence which meets an extraordinarily high standard, and [undermines] the prosecution’s entire case.” Specifically, he revisits the theory that Adam was the male perpetrator, based on post-conviction testimony from Ofc. Perry Fleming, who testified that “a known, reliable confidential informant told him that Keith Jackson (an alias of Adam’s) had boasted about killing a policeman in New Orleans;” evidence that Adam was apprehended in 1998 with a weapon matching the description of the Beretta used in this case; and testimony from a *868 former fellow inmate of Adam’s, Darren Reppond, who asserted Adam confessed to having shot an NOPD officer in the head at a restaurant because the officer was “shaking him and his sister down for money.” Adam testified below and, not surprisingly, denied having made such a confession.
The district court weighed this evidence and rejected LaCaze’s theory, specifically noting the weaknesses in his new evidence, including that Reppond’s retelling of Adam’s alleged confession was incomplete as to the offense circumstances; that Rep-pond did not inform LaCaze’s attorneys of Adam’s confession when they initially contacted him, an omission the district court found indicative of fabrication; and that Reppond — who attributed his ability to recall the confession to it having been “so definite about the details” — “suffered a memory failure” when asked for those details at the post-conviction hearing.
1 X7As set out above this Court has opined that a non-DNA actual innocence claim, if cognizable, requires new material, noncumulative and conclusive evidence which meets an extraordinarily high standard and undermines the state’s entire case, Conway, 01-2808, 816 So.2d at 291. More recently, in State v. Pierre, 13-0873 (La. 10/15/13), 125 So.3d 403, the Court further articulated that the new facts must be so compelling that no reasonable juror could have voted to convict with knowledge thereof. Id., 13-0873, pp. 9-10,125 So.3d at 409 (adopting the standard for federal ha-beas relief set out in McQuiggin v. Perkins, 569 U.S. -, 133 S.Ct. 1924, 1933, 185 L.Ed.2d 1019 (2013)).
The district court was within its discretion to find LaCaze’s evidence fell short. See State v. Mussall, 523 So.2d 1305, 1310 (La. 1988) (fact finder makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; reviewing courts may impinge on the “fact finder’s discretion only to the extent necessary to guarantee the fundamental due process of law.”). The evidence that Adam boasted about the murders appears entirely insufficient to prove that “no reasonable juror could have voted to convict” LaCaze, had it been presented at trial, in a case in which the state presented evidence that LaCaze accompanied Frank to Walmart to shop for 9 mm ammunition within hours of the murders; that survivors (who saw LaCaze with Frank twice earlier that same evening) positively identified LaCaze as the male perpetrator who rummaged through their property after the gunfire ceased; that LaCaze’s initial statements contained details only the perpetrators could have known; that LaCaze’s trial testimony admitted his presence in the restaurant earlier that night, contradicting his alibi in which he claimed he was at the pool hall; and that LaCaze was observed within an hour of the murders using Ofc. Williams’s stolen credit eard to purchase gas at a Chevron station near his brother’s apartment. The district court’s conclusion is further bolstered by evidence that LaCaze and hsAdam had such different physical appearances that for the surviving victims to have confused Adam — whom they had known for some time — with LaCaze would have been nearly impossible, even under the traumatic conditions: The survivors identified Frank’s accomplice as a black male with gold teeth across the top, less than 20 years of age, and just over five feet tall. LaCaze was 18 years old, 5’3" in height, and had gold teeth. Adam was 24 years of age and 6’5" in height. LaCaze, 99-0584, p. 3 n.4, 824 So.2d at 1066 n.4.
For the foregoing reasons, the Fourth Circuit correctly reversed the order for a new trial.

. The district court contrasted the instant case with State v. Deruise, 98-0541, p. 12 (La. 4/3/01), 802 So.2d 1224, 1235, which was also pending on appeal when Simmons was overturned, and in which the Court rejected the defendant’s claim that an NOPD officer was erroneously seated on the jury, because in ' Demise the juror at issue disclosed his law enforcement experience and thereby enabled the parties to question him about possible bias. In Demise, this Court found the lack of clarity in the record as to whether the defense issued a challenge for cause to that juror was immaterial given that, "[e]ven assuming the defense unsuccessfully challenged [the officer] for cause, the trial court’s denial of that challenge would not have constituted reversible error,” because the courts no longer presume police officers are incompetent to serve as jurors. Id.., 98-0541,p. 12, 802 So.2d at 1235.

. LaCaze also fails to make the required showings as to the seating of jurors Victoria Mushatt and Lillian Garrett. He asserts Ms. Mushatt failed to disclose that she "felt like [she] knew” victim Ofc. Williams through her employment as a 911 dispatcher; that she was "present in the dispatch room” when 911 calls came through reporting the murders; and that she attended Ofc. Williams’s funeral. However, as the district court found, La-Caze’s assertion that Ms. Mushatt “knew” Ofc. Williams and was thereby biased is unfounded: rather than implying that she had any sort of relationship with the slain officer, Ms. Mushatt testified that she had never met Ofc. Williams but was familiar with his name, as she was with other officers' names, from repeatedly hearing it over the dispatch. She explained that she attended his funeral along with the entire department only because it was “expected” they would. As for LaCaze’s assertion that Ms. Mushatt became privy to sensitive details because she was working when the shooting was reported, he altogether fails to show that she — who was not the dispatcher to accept the related 911 calls— was aware of any prejudicial information, let alone specify those prejudicial details. LaCaze also shows no ground for relief based on Lillian Garrett’s presence on the jury. He claims Ms. Garrett deceived the court during voir dire when, after being asked whether any close relations had been a victim of a crime, she failed to respond, although two of her brothers were murdered. Even if Ms. Garrett failed to honestly answer the question, La-Caze has not shown she would have been subject to a meritorious challenge for cause if she had. As the district court found, LaCaze offers no evidence that Ms. Garrett consciously withheld the information about her brothers to get onto the jury (for the purpose of avenging her brothers' murders, or otherwise). See Dryer v. Calderon, supra (even intentionally dishonest answers are not fatal, as long as the falsity does not bespeak a lack of impartiality). As with the other two jurors he complains of, LaCaze offers no evidence that Ms. Garrett harbored any bias and points to no specific facts from which bias must be presumed. Her post-conviction affidavit was apparently devoid of any admissions to this effect, and LaCaze’s bare assertions in lieu thereof are insufficient. La.C.Cr.P. art. 930.2. The district court correctly rejected these claims.

. The district court’s minute entry indicates defense counsel orally moved for Judge Ma-rullo’s recusal during the trial, although it is unclear on what basis. Judge James McKay denied the motion after a hearing. See Minute Entry for 7/17/95. Subsequently, post-conviction, Judge Marullo recused himself in advance of being called to testify in connection with this claim at LaCaze’s evidentiary hearing. See Minute Entry for 6/18/10,

. For example, the day of the murders, "a uniformed Frank and a young African-American male with gold teeth were in Wal-Mart inquiring about 9 mm cartridges. They left without making a purchase.” LaCaze, 99-0584, p. 8, 824 So.2d at 1070.

. LaCaze also urges — by way of a bullet-point list accompanied by scant argument — that other items were suppressed. His terse presentation is insufficient to show that any of the alleged suppressions warrant this Court’s intervention. See La.S.Ct.R. X, § 4(3)(d) (requiring "argument of each assignment of error on the facts and the law...La.S.Ct.R. VII, § 6 (assignments of error made but not briefed considered abandoned); State v. Bay, 529 So.2d 845, 851 (La. 1988). For example, he claims the state was required to disclose that two surviving victims reported seeing him carrying a cell phone earlier on the evening of the crimes, evidence he claims was material because it supports his theory that, if he possessed his cell phone some hours before the crime, he was not with Frank when she committed the murders because his phone records show he called her at that time. This claim fails the Brady materiality standard because LaCaze has not shown that without the statements, he received an unfair trial resulting in a verdict not worthy of confidence, and more closely resembles an attempt to re-litigate the sufficiency of the evidence. The district court’s detailed assessment finding these claims meritless was well-founded.

. This claim was also subject to dismissal for the reason that the witness who allegedly gave misleading testimony was, at the time of the testimony complained of, a defense witness. The jurisprudence condemning presentation of false and misleading testimony generally pertains to the state, given that such testimony contravenes a defendant’s due process rights, rights he presumably cannot himself violate. See Napue, 360 U.S. at 269, 79 S.Ct. at 1177 (“[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.”).

. Because Mr. Turk is deceased, he did not testify at the hearing below.