# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #012

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **13th day of March, 2018**, are as follows:

**BY WEIMER, J.**:

2016-KP-0234    STATE OF LOUISIANA v. ROGERS LACAZE (Parish of Orleans)

> This matter is currently before the court in light of the remand by the United States Supreme Court in LaCaze v. Louisiana, 138 S.Ct. 60 (2017), which vacated the decision in State v. LaCaze, 16-0234 (La. 12/16/16), 208 So.3d 856, in which the defendant's writ application related to his petition for post-conviction relief was denied, and the defendant's conviction was upheld. On remand, this court was instructed to consider whether the trial judge's recusal should have been required because "objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable'" under the circumstances. After carefully considering all the facts, we find the defendant has not shown that the circumstances created an unconstitutionally high risk of bias, and the original denial of the defendant's recusal claim in LaCaze, 16-0234, 208 So.3d 856, is correct.
>
> For the foregoing reasons, we find that the court of appeal correctly reversed the trial court's order for a new trial and properly reinstated Defendant's conviction. Defendant's request for substantive relief is denied.
>
> WRIT DENIED.

**03/13/18**

# SUPREME COURT OF LOUISIANA

## NO. 2016-KP-0234

## STATE OF LOUISIANA

## VERSUS

## ROGERS LACAZE

*ON REMAND FROM THE UNITED STATES SUPREME COURT*

**WEIMER**, Justice.

This matter is currently before the court in light of the remand by the United States Supreme Court in **LaCaze v. Louisiana**, 138 S.Ct. 60 (2017), which vacated the decision in **State v. LaCaze**, 16-0234 (La. 12/16/16), 208 So.3d 856, in which the defendant's writ application related to his petition for post-conviction relief was denied, and the defendant's conviction was upheld. On remand, this court was instructed to consider whether the trial judge's recusal should have been required because "objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable'" under the circumstances.[1] After carefully considering all the facts, we find the defendant has not shown that the circumstances created an unconstitutionally high risk of bias, and

---

[1] See **Rippo v. Baker**, 137 S.Ct. 905, 907 (2017).

the original denial of the defendant's recusal claim in **LaCaze**, 16-0234, 208 So.3d 856, is correct.

## FACTS AND PROCEDURAL HISTORY

On March 4, 1995, Rogers LaCaze (Defendant) and Antoinette Frank (Frank), then an officer of the New Orleans Police Department (NOPD), dined together at Kim Anh Vietnamese restaurant in New Orleans East just before closing time.[2] They returned shortly after closing in Frank's police unit, apparently to commit armed robbery despite the presence of off-duty NOPD Officer Ronnie Williams. Officer Williams and two restaurant employees (siblings Ha and Cuong Vu) were fatally shot during the ensuing encounter.[3]

Defendant and Frank were indicted for the triple murders and were separately tried–both before Judge Frank Marullo. Defendant's trial was held first. In closing argument at Defendant's trial, the state conceded that no survivors had witnessed the shootings and that "we will never know [precisely] what happened" to the Vu siblings in the kitchen, but nevertheless maintained the evidence showed that Defendant shot Officer Williams as Frank gathered the others in the kitchen area. **State v. LaCaze**, 99-0584, p. 10 (La. 1/25/02), 824 So.2d 1063, 1071. The state also conceded that it appeared that just one gun, a 9 mm pistol, was used to kill all three victims, but asserted it was immaterial which perpetrator had pulled the trigger because the evidence showed that both were present and exhibited specific intent to kill. **Id.**, 99-0584 at 10, 824 So.2d at 1071-72.

A jury found Defendant guilty of three counts of first degree murder and unanimously sentenced him to death. His conviction and sentence were affirmed by

---

[2] Frank knew the owners of the restaurant as she had previously worked security for them at the restaurant.

[3] **State v. LaCaze**, 16-0234, pp. 1-3 (La. 12/16/16), 208 So.3d 856, 858-59.

this court in **LaCaze**, 99-0584, 824 So.2d 1063, and Defendant's writ of certiorari was denied in **LaCaze v. Louisiana**, 537 U.S. 865 (2002).

Post conviction, Defendant learned that, in the course of investigating the murders, NOPD discovered that Frank obtained two guns from the NOPD property and evidence room, one of which (a 9 mm pistol) was the same type used in the triple murders for which Defendant was convicted. Both guns were released to Frank by Officer David Talley.[4] Before Defendant's trial, the NOPD Public Integrity Bureau (Bureau) commenced an investigation into whether Talley had violated departmental rules and regulations in releasing the guns. The non-9 mm gun was released to Frank pursuant to an order purportedly signed by Judge Morris Reed; however, when shown the order by Bureau investigators, Judge Reed denied that the signature on the order was his, observing that his name was misspelled ("Reid").

Bureau investigators also inquired into whether the 9 mm gun was released pursuant to a legitimate order signed by Judge Frank Marullo, *i.e*., whether Judge Marullo's signature on the release was genuine. Notably, Frank falsely reported the 9 mm gun stolen 10 days before the murders. In late 1998, roughly three years after Defendant and Frank's trials, a 9 mm gun with partial serial numbers, suggesting that it may have been the murder weapon, was found in possession of Frank's brother, Adam Frank.

Judge Marullo cooperated with the Bureau's internal investigation of Officer Talley before Defendant's case was assigned to his docket. When initially interviewing Judge Marullo, Bureau investigator Sergeant Robert Harrison presented the release order purportedly bearing Judge Marullo's signature, at which point Judge Marullo "viewed the document, and compared it to several other documents with his

---

[4] Officer Talley was then in charge of the NOPD property and evidence room gun vault.

4

signature," before stating that "he did not believe the court order in question was his signature." Judge Marullo explained to Sgt. Harrison that "[s]ince the court order did not have a description of the weapon to be released, he would not have signed [it]."

From this exchange, Sgt. Harrison opined that the signature had been forged. To support his opinion, Sgt. Harrison again contacted Judge Marullo to secure a recorded statement. Because Defendant's case had been assigned to Judge Marullo, the judge "would not make a statement ... until the case ha[d] reached its final disposition." As a result, the Bureau investigation of Officer Talley remained open through the duration of Defendant's trial and Frank's trial for the purpose of obtaining a statement from Judge Marullo.

Judge Marullo did not disclose to the parties in Defendant's case his awareness of the Bureau's internal investigation of Officer Talley or the fact that he had been questioned by Bureau investigators about the release of the guns, even after Defendant filed (early during the course of his trial) a motion to recuse Judge Marullo on other grounds. The information that there was an investigation surfaced during co-defendant Frank's subsequent trial in connection with Officer Talley's testimony about the release of guns from the property room to Frank. When Frank's counsel raised the possibility that Judge Marullo's signature on the order authorizing the gun's release was a forgery, Judge Marullo recessed and held a recorded conference, during which Judge Marullo disclosed that there was a Bureau investigation into the circumstances of the gun's release, including as to the genuineness of his signature. Specifically, Judge Marullo stated that he did not recall signing the order, but that it would have been "perfectly logical and correct that [he] would [have done] something like that." Judge Marullo stated that he had provided samples of his signature to a handwriting expert for comparison and "they came back and told me

5

that it wasn't my signature."[5] Judge Marullo also opined that it appeared there had been "some kind of system in that property room where they were forging names to get guns out of there."[6]

After the trials of both Defendant and Frank, Sgt. Harrison contacted Judge Marullo again, at which time the judge declined to comment because the cases "would be with him for a long time because of appeals."

In response to the Bureau inquiry, Officer Talley acknowledged that he helped Frank obtain a 9 mm gun from the NOPD property room months before the murders; that he had spoken with Frank inside the NOPD gun vault days before the murders about the release of additional weapons, which would have afforded Frank the opportunity to remove another weapon from the vault without his knowledge when he left her alone in the property room; and that he had once before helped Frank obtain another gun from the property room. As to the 9 mm gun at issue, Officer Talley explained to Bureau investigators that he "brought a court order to Judge Marullo" to facilitate its release, and "Judge Marullo's clerk took ... it to the Judge's chambers" and "returned with the order signed by [the] Judge."

When Defendant learned that Judge Marullo had been questioned during the Bureau's investigation of Officer Talley, Defendant filed a pro-se application for post-conviction relief, followed by a counseled supplement in May 2010. Defendant alleged that he was denied the right to a fair and impartial tribunal in the trial of his capital case in violation of his federal constitutional rights.

---

[5] Sgt. Harrison's report and subsequent testimony at the hearing before the Civil Service Commission convened to evaluate Officer Talley's role in the release of the guns indicated that other witnesses, but not Judge Marullo, had supplied handwriting samples.

[6] As to the admissibility of related testimony at Frank's trial, Judge Marullo ruled that the prosecutor in Frank's case could only elicit testimony to show that Officer Talley provided a 9 mm gun to Frank before the murders, but not as to how Officer Talley had obtained the gun.

Because this issue was raised by Defendant, Judge Marullo was recused from presiding over the post-conviction proceedings. Thereafter, a judge from a different jurisdiction was appointed to preside over Defendant's request for post-conviction relief. In June 2013, the trial court held an evidentiary hearing at which over 20 witnesses, including Officer Talley and Judge Marullo, testified. Officer Talley again conceded having helped Frank get the 9 mm gun, but maintained he did not forge Judge Marullo's signature. Judge Marullo testified that he recalled being questioned by Bureau investigators, but denied ever signing an order to release the gun, calling it a "phony" signature. Judge Marullo testified that he did not recall his statement at the in-chambers conference during Frank's trial in which he indicated he had provided someone with handwriting samples. Finally, Judge Marullo denied that these events caused him to harbor any bias.

On July 23, 2015, the trial court issued a 128-page judgment with reasons in connection with Defendant's petition for post-conviction relief. The trial court rejected Defendant's claim regarding Judge Marullo, observing that this case involves "a classic example of circumstances and appearances creating an inference unsupported by facts," however, it vacated Defendant's conviction and sentence on the basis of a structural defect–a juror was seated after failing to disclose his law enforcement experience. Accordingly, Defendant's request for a new trial was granted. The state filed a writ application with the appellate court, asserting that the trial court abused its discretion in making findings related to the qualifications of a juror, errors the state urged were compounded when the trial court incorrectly applied the law.[7] In an opposition, Defendant urged that the trial court correctly found a structural defect in the seating of the juror in question. He further argued that the

_____

[7] In seeking review, the state did not ask to have the death sentences reinstated.

7

other claims before the trial court also had merit. Those claims included one that Defendant "was tried before a biased tribunal."

In a one-page action, Defendant's conviction was reinstated, see **State v. LaCaze**, 15-0891 (La.App. 4 Cir. 1/6/16) (unpub'd), on a finding the juror's seating was not a structural defect. Additionally, no error was found in the trial court's rejection of Defendant's remaining claims, including his due process claim based on the appearance of bias resulting from Judge Marullo presiding over the trial. This court subsequently denied writs, issuing an opinion finding that the court of appeal correctly reversed the trial court's order for a new trial and reinstated the conviction. **State v. LaCaze**, 16-0234 at 1, 208 So.3d at 858. Pertinent here is this court's review of Defendant's due process claim concerning Judge Marullo, which was based on: (1) the allegation that "NOPD Investigated Judge Marullo as the Source of the 9mm Beretta Murder Weapon During the Pendency of these Proceedings" and (2) "Judge Marullo's Involvement in the [Bureau] Investigation Mandated His Recusal." In analyzing Defendant's claim, this court noted the presumption of impartiality in favor of a trial judge. **LaCaze**, 16-0234 at 10, 208 So.3d at 864. After recognizing that a judge in a criminal case shall be recused under La. C.Cr.P. art. 671(A)(1) if he is "biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial" and under La. C.Cr.P. art. 671(A)(6) if he "[w]ould be unable, for any other reason, to conduct a fair and impartial trial," this court observed that Article 671 "underscores a judge's duty to avoid even the appearance of impropriety." **LaCaze**, 16-0234 at 10, 208 So.3d at 864.

This court further found that Judge Marullo's possible connection to the release of a gun to Frank is insufficient to show that Judge Marullo "harbored any bias,

8

prejudice, or personal interest in the case, let alone to such an extent that it rendered him unable to conduct a fair trial." *Id.* After finding lack of proof of actual bias, this court further found that evidence related to Judge Marullo being questioned in the Bureau's internal investigation of Officer Talley was insufficient to show that Judge Marullo would be unable to conduct a fair trial for some other reason. See **LaCaze**, 16-0234 at 10-11, 208 So.3d at 864 (citing La. C.Cr.P. art. 671(A)(6), quoted *infra*). Defendant's argument that Judge Marullo's initial participation in the internal investigation of Officer Talley caused him to become entangled in the facts at issue in Defendant's case was rejected by this court. The means by which the murder weapon was procured, *i.e.*, whether Frank had obtained it pursuant to a genuine or "bogus" court order, did not pertain to any of the issues at Defendant's trial. See **LaCaze**, 16-0234 at 11, 208 So.3d at 864. Furthermore, this court held that Judge Marullo's possible involvement in the administrative release of a gun did not "have a tendency to make the existence of any fact of consequence [ ] more or less probable," and was thus insufficient to rebut the presumption of impartiality afforded to judges. See *id.*

Subsequently, the United States Supreme Court in **Rippo v. Baker**, 137 S.Ct. 905 (2017), clarified the standard for judicial disqualification in criminal cases under the federal due process clause. Based on this clarification, the Supreme Court granted Defendant's petition for writ of certiorari, vacated this court's decision in **LaCaze** (208 So.3d 856), and remanded the matter to this court for further consideration of this issue. **LaCaze v. Louisiana**, 138 S.Ct. 60 (2017).

## DISCUSSION

The Due Process Clause of the United States Constitution requires "a fair trial in a fair tribunal," before a judge with no bias or interest in the outcome. **Bracy v.**

**Gramley**, 520 U.S. 899, 904-05 (1997) (quoting **Withrow v. Larkin**, 421 U.S. 35, 46 (1975)). Louisiana courts have generally required criminal defendants to present evidence of actual bias to obtain relief based on a judge's failure to recuse.[8] The Supreme Court's intervention in **Rippo**, and again in this case, however, directs that recusal may be required even where proof of actual bias is lacking.

In remanding for reconsideration here, the Supreme Court referenced its recent decision in **Rippo**, in which it clarified the judicial disqualification standard in the context of the federal constitutional right to due process. See **Rippo**, 137 S.Ct. at 907. During his trial, the defendant in **Rippo** received information indicating that the presiding judge was a target of a federal bribery probe. *Id.* at 906. From this, the defendant surmised that the same district attorney's office that was prosecuting him was also investigating the judge. The defendant unsuccessfully moved for the trial judge's recusal under the theory that the judge could not remain impartial in a matter in which one of the parties before him was actively investigating him for criminal wrongdoing. *Id.*

Having failed to make his case on direct review, the defendant in **Rippo** revisited the issue post-conviction, this time offering records from the trial judge's subsequent criminal prosecution that established the same district attorney's office that prosecuted the defendant had, as he suspected, been concurrently investigating the trial judge. *Id.* The state courts in **Rippo** again rejected the defendant's claim, denying the defendant the opportunity for "discovery or an evidentiary hearing [on

---

[8] See, e.g., **State In Interest of M.J.**, 14-0622, p. 26 (La.App. 4 Cir. 2/4/15), 160 So.3d 1040, 1055, writ denied, 15-0487 (La. 1/15/16), 184 So.3d 704 (rejecting recusal argument because juvenile defendant pointed to nothing "that would support a finding of actual bias or prejudice"); **State v. Doleman**, 02-0957, p. 10 (La.App. 4 Cir. 12/4/02), 835 So.2d 850, 858, writ denied, 02-3101 (La. 9/19/03), 853 So.2d 633 (finding no evidence of actual bias); **State v. Taylor**, 07-93, p. 11 (La.App. 5 Cir. 11/27/07), 973 So.2d 83, 92, writ denied, 07-2454 (La. 5/9/08), 980 So.2d 688 (finding no evidence of actual bias).

the recusal issue] because his allegations '[d]id not support the assertion that the trial judge was actually biased in [the defendant's] case.'" ***Id.***, at 906-07 (quoting **Rippo v. State**, 368 P.3d 729, 744 (Nev. 2016)).

From the denial of his request for post-conviction relief by the state courts, the defendant filed a petition for writ of certiorari. In evaluating the state court judgment in **Rippo**, the Supreme Court held that evidence of actual bias is not necessary to require recusal. See ***id.***, 137 S.Ct. at 907 (citing **Aetna Life Ins. Co. v. Lavoie**, 475 U.S. 813, 825 (1986)). The Court clarified that the inquiry for judicial disqualification is instead whether, "objectively speaking, 'the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable'" under the circumstances. ***Id.*** (quoting **Withrow**, 421 U.S. at 47); see **Caperton v. A.T. Massey Coal Co., Inc.**, 556 U.S. 868, 889-90 (2009). In applying this standard, the court must determine "whether, as an objective matter, the average judge in his position is likely to be neutral, or whether there is an unconstitutional potential for bias." **Rippo**, 137 S.Ct. 907 (quoting **Williams v. Pennsylvania**, 136 S.Ct. 1899, 1905 (2016)). Accordingly, the state supreme court's decision in **Rippo**, which affirmed the trial court's rejection of the defendant's recusal claim based on lack of proof of actual bias, was vacated, and the case was remanded to the state supreme court for further consideration of Defendant's federal due process claim under the clarified standard. ***Id.*** Notably, the Supreme Court in **Rippo** did not find that the defendant was entitled to substantive relief, but instead simply clarified the federal standard to be applied by the state supreme court on remand. On remand, the state supreme "court is free to determine whether its original decision is still correct in light of the [clarified standard] or whether a different result is more appropriate."

11

See **Kenemore v. Roy**, 690 F.3d 639, 642 (5th Cir. 2012), <u>cert. denied</u>, 133 S.Ct. 889

(2013).[9]

In light of the Supreme Court's remand, this court, like the state supreme court

in **Rippo**, is now called on to decide whether the original decision in **LaCaze**,

16-0234, 208 So.3d 856, is correct in light of the clarified standard. As a basis for his

federal due process claim, Defendant relies on the following facts:

- NOPD conducted an internal investigation into Officer Talley's release to Frank, then an NOPD officer, of two guns from the property room, one of which, a 9 mm released in August 1994, could have been used in the March 1995 murders.
- Bureau investigators found that Officer Talley's release of the 9 mm gun had involved the use of a release order purportedly signed by Judge Marullo, which Officer Talley maintained was authentic.
- When asked to review the order, Judge Marullo told the Bureau investigator that he did not believe the signature was authentic.
- Defendant's case was allotted to Judge Marullo's courtroom, after which he declined, when asked, to make further statements to the investigator while the case remained open.
- Judge Marullo did not disclose to the parties his statement to the Bureau investigator or his knowledge of the investigation itself.

Defendant maintains these circumstances are precisely the sort of extreme

circumstances that give rise to a federal due process violation, creating an

unconstitutional appearance of impropriety or bias. In support of his argument,

Defendant relies substantially on **Liljeberg v. Health Services Acquisition Corp.**,

486 U.S. 847 (1988), which involved a trial judge's failure to provide a full disclosure

of relevant facts in violation of a federal statute requiring disqualification of a federal

judge if "he, individually or as a fiduciary, or his spouse or minor child residing in his

household, has a financial interest in the subject matter in controversy or in a party

to the proceeding, or any other interest that could be substantially affected by the

outcome of the proceeding." *Id.* at 858-59 (quoting 28 U.S.C. § 455(b)).

---

[9] <u>See also</u> **Flowers v. Mississippi**, 136 S.Ct. 2157, 2157-58 (2016) (Alito, Thomas, JJ., dissenting); **Diaz v. Stephens**, 731 F.3d 370, 378 (5th Cir. 2013), <u>cert. denied</u>, 134 S.Ct. 48 (2013).

Citing **Liljeberg**, Defendant states that nondisclosure is a "fact[] that might reasonably cause an objective observer to question [a judge's] impartiality." See *id.* at 865. For this reason, Defendant urges that, under **Liljeberg**, federal due process requires that the judge make full disclosure of known facts that might be relevant to an appearance of bias to completely remove any basis for questioning the judge's impartiality. See *id.* at 866. According to Defendant, the absence of full disclosure gives rise to an unconstitutional potential for bias.

Notably, La. Code of Judicial Conduct, Canon 2 requires that: "A Judge … Avoid Impropriety and the Appearance of Impropriety in All Activities," and La. C.Cr.P. art. 671, which lists the grounds for recusal,[10] requires recusal if a judge is a witness in the cause and underscores the duty to avoid even the appearance of impropriety. See **State v. LeBlanc**, 367 So. 2d 335, 341 (La. 1979) ("[T]he appearance of impartiality, as well as impartiality itself, outweighs the inconvenience caused by the recusal of the trial judge."

Even if Defendant has identified a potential violation of state law or the judicial canons in Judge Marullo's failure to disclose, such a violation is alone insufficient

---

[10] Louisiana C.Cr.P. art. 671 (A) provides:

> In a criminal case a judge of any court, trial or appellate, shall be recused when he:
> (1)    Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
> (2)    Is the spouse of the accused, of the party injured, of an attorney employed in the cause, or of the district attorney; or is related to the accused or the party injured, or to the spouse of the accused or party injured, within the fourth degree; or is related to an attorney employed in the cause or to the district attorney, or to the spouse of either, within the second degree;
> (3)    Has been employed or consulted as an attorney in the cause, or has been associated with an attorney during the latter's employment in the cause;
> (4)    Is a witness in the cause;
> (5)    Has performed a judicial act in the case in another court; or
> (6)    Would be unable, for any other reason, to conduct a fair and impartial trial.

to warrant a new trial in this case. Similarly, as indicated in **Caperton**, circumstances that run afoul of state law or judicial canons do not necessarily violate federal due process, which is the issue currently before this court.[11] Nonetheless, state law or judicial canon considerations may be relevant to the determination of whether Judge Marullo is subject to disqualification under the **Rippo** standard.

A judicial disqualification under the Due Process Clause first requires that an objective "probability of actual bias" be established. Thus, the state correctly notes that proof of an appearance of bias alone is insufficient to show a violation of federal due process.[12] The **Rippo** standard clearly requires proof that an appearance of bias gives rise to a "probability of actual bias," also referred to as a "risk of bias" or "potential for bias."[13] See **Rippo**, 137 S.Ct. at 907. Secondly, the defendant must prove that the probability of actual bias rises to a level that "is too high to be constitutionally tolerable" under the circumstances. See *id.*

---

[11] See **Caperton**, 556 U.S. at 889-90 (states may "adopt recusal standards more rigorous than due process requires;" federal "Due Process Clause demarks only the outer boundaries of judicial disqualifications," and leaves it to the legislature and the states to "impose more rigorous standards" for judicial disqualification); **Bracy**, 520 U.S. at 904 (distinguishing the "constitutional floor" from the ceiling set "by common law, statute, or the professional standards of the bench and bar"). See, e.g., **People v. Freeman**, 222 P.3d 177, 178 (applying **Caperton** and finding an appearance of impropriety, as proscribed under California law, is not enough to warrant judicial disqualification under the federal standard: "while a showing of actual bias is not required for judicial disqualification under the due process clause, neither is the mere appearance of bias sufficient. Instead, based on an objective assessment of the circumstances in the particular case, there must exist ... 'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable.'").

[12] "The Supreme Court has never rested the vaunted principle of due process on something as subjective and transitory as appearance." **Del Vecchio v. Illinois Dept. of Corrections**, 31 F.3d 1363, 1371-72 (7th Cir. 1994), cert. denied, 514 U.S. 1037 (1994). **Liljeberg**, which involved the application of a federal statute in the disqualification determination, neither holds nor suggests that "an appearance of bias on the part of a federal judge, without more, violates the Due Process Clause." **Johnson v. Carroll**, 369 F.3d 253, 262 (3rd Cir. 2004), cert. denied, 544 U.S. 924 (2005).

[13] "[I]n the absence of *any* possibility of actual bias–that is, based *solely* on how the situation might have 'appeared' to an outside observer ... [t]he Supreme Court has never held, or even intimated, that the due process clause requires recusal." **Suh v. Pierce**, 630 F.3d 685, 692 (7th Cir. 2011).

Defendant suggests (relying on **Tumey v. State of Ohio**, 273 U.S. 510, 535 (1927), in which the judge had a direct, substantial pecuniary interest in the outcome of the defendant's case) that even a small probability of bias on the part of the person who is supposed to be the neutral adjudicator, here Judge Marullo, offends due process. Such a test is inconsistent with the wording of the **Rippo** standard and would render the "too high to be constitutionally tolerable" portion of the standard extraneous. Under the standard, proof of any probability of bias alone is insufficient. Notably, the jurisprudence does not indicate that proof of nondisclosure of information giving rise to any probability of bias automatically renders the probability of bias "too high to be constitutionally tolerable."

The jurisprudence reveals that an unconstitutional probability of bias exists when:

- The judge has a direct, substantial pecuniary interest in the outcome of the defendant's case,[14]
- the judge's election campaign received exceptionally large financial donations from one of the parties,[15]
- the sentencing judge formerly worked as a prosecutor in another case against the defendant and the judge had earlier "communication, correspondence, and cooperation as a prosecutor" with the prosecutor in the other case against the defendant,[16]
- the judge "presiding at the contempt hearing had also served as the 'one-man grand jury' out of which the contempt charges arose,"[17]
- the judge has made a critical decision (approved of seeking the death penalty) while a former prosecutor in the pending prosecution,[18]
- the appellate judge presided over the trial of the matter,[19]

---

[14] See **Tumey**, 273 U.S. at 523, 535; **Aetna Life Insurance Co.**, 475 U.S. at 822, 824 (the judge was involved as a party in a separate, but similar, lawsuit).

[15] See **Caperton**, 556 U.S. at 884.

[16] See **Smith v. State**, 357 S.W.3d 322, 345 (Tenn. 2011), cert. denied, 568 U.S. 828 (2012).

[17] See **In re Murchison**, 349 U.S. 133, 134, 138-39 (1955).

[18] See **Williams**, 136 S.Ct. at 1905 (applied the **Caperton** standard for judicial disqualification and found that no person can serve "as both accuser and adjudicator in a case.").

[19] See **People v. Novak**, 88 N.E.3d 305, 307 (N.Y. 2017).

- the judge has taken bribes from other criminal defendants,[20]
- the judge has both executive and judicial responsibility in the matter,[21] and
- the judge was a defendant in prior litigation involving one of the parties.[22]

None of these risks is present in the instant case. Judge Marullo did not have a pecuniary interest in Defendant's case. He had no prosecutorial involvement with the Defendant or in this matter. He did not have an unacceptable relationship with Defendant or the prosecutors. He had no reason to fear criminal prosecution in connection with the release of the gun to Frank.

Judge Marullo's communication and initial cooperation in the Bureau investigation into how the 9 mm gun was released was not adversarial or accusatory toward Defendant. Significantly, and most importantly, it was Officer Talley, not Judge Marullo, who was the subject of the Bureau's investigation. Contrary to any prior representations to the courts, there is absolutely no evidence in the record that Judge Marullo was under investigation himself for any of these events. Even if Judge Marullo, in fact, signed the order that authorized release of the 9 mm gun to Frank, Judge Marullo did nothing wrong; he was merely performing a ministerial act that he was fully authorized to perform.

The defense's theory at trial was that Defendant did not participate in the homicide, but believed that Frank had planned and committed the murders with her

---

[20] See **Bracy**, 520 U.S. at 900-01, 909 (the judge's subsequent conviction for accepting bribes from defendants in criminal cases was sufficient proof to afford discovery on his claim of actual judicial bias in his case–judge had an interest in the defendant's conviction).

[21] See **Ward v. Village of Monroeville, Ohio**, 409 U.S. 57, 61-62 (1972) (where the mayor before whom petitioner was compelled to stand trial for traffic offenses was responsible for village finances, and mayor's court through fines, forfeitures, costs and fees, provided a substantial portion of the village funds, petitioner was denied a trial before a disinterested and impartial judicial officer as guaranteed by the due process clause).

[22] See **Johnson v Mississippi**, 403 U.S. 212, 215-16 (1971).

brother, Adam Frank, after obtaining a 9 mm gun from the police property room. In support of this theory, Defendant testified that Frank told Defendant that she expected to get a weapon from the property room. According to Defendant, state law requires Judge Marullo's recusal since he could have been called as a witness at Defendant's trial to corroborate the Defendant's testimony that Frank procured a 9 mm gun from a friend in the NOPD property room to commit the crime. However, Judge Marullo did not have personal knowledge or direct evidence of the actions of Officer Talley or Frank. Judge Marullo is not alleged to have had any direct contact with Officer Talley or Frank in connection with the release of the 9 mm gun. Judge Marullo only knows what he was told by the Bureau investigator and what was visible from the face of the order, which he believes was forged. There is no indication that Judge Marullo heard of Officer Talley's account of the gun release until Officer Talley later appeared and testified at Frank's trial. If, in fact, Judge Marullo did not sign the order, he has no direct knowledge of the release of the 9 mm gun and would not be in a position to corroborate Defendant's testimony. Even if Judge Marullo had personal knowledge of information that might be corroborative, such information is neutral in the sense that it does not aid either party. If at all helpful, it would be more corroborative of the state's "evidence that his accomplice obtained the same type of gun that was used to kill the victims, in a case in which the state presented evidence that he and Frank had been acting in concert under the guise of her authority and, together, premeditated the murders and were equally culpable." **LaCaze**, 16-0234 at 12, 208 So.3d at 865 (footnote omitted).

Although it is possible that the 9 mm gun released from the property room to Frank pursuant to the order purportedly signed by Judge Marullo was used in the

17

murders at the Kim Anh restaurant, that fact has never been definitively established.[23]

The fact that Frank got a 9 mm gun from the property room does not exculpate Defendant, especially in light of the abundant evidence of his guilt.[24] That Frank might have once possessed the 9 mm gun that was used to kill Officer Williams and the Vu siblings does not overcome the evidence that showed Defendant was the one who possessed the murder weapon when Officer Williams was shot. See **LaCaze**, 99-0584 at 2-4, 824 So.2d at 1066-67.[25] Furthermore, contrary to Defendant's suggestion, the facts do not indicate that Judge Marullo was trying to conceal the information in question from Defendant during Defendant's trial or that Judge Marullo thought this information would harm or help Defendant's defense.

---

[23] As indicated, a 9 mm gun with a partial serial number that matched the one released from the property and evidence room to Frank was found in the possession of Frank's brother (Adam) three years after Defendant and Frank were convicted. That gun could have been used in the murders of Officer Williams and the Vu siblings and thereafter been handed off to Frank's brother Adam.

[24] The trial judge, who was sitting *ad hoc* to preside over the post-conviction hearing, weighed the evidence and rejected Defendant's theory of innocence, noting the weakness of his evidence: "the state presented evidence that [Defendant] accompanied Frank to Walmart to shop for 9 mm ammunition within hours of the murders; that survivors (who saw [Defendant] with Frank twice earlier that same evening) positively identified [Defendant] as the male perpetrator who rummaged through their property after the gunfire ceased; that [Defendant's] initial statements contained details only the perpetrators could have known; that [Defendant's] trial testimony admitted his presence in the restaurant earlier that night, contradicting his alibi in which he claimed he was at the pool hall; and that [Defendant] was observed within an hour of the murders using Ofc. Williams's stolen credit card to purchase gas at a Chevron station near his brother's apartment." **LaCaze**, 16-0234 at 17, 208 So.3d at 868. The differences in their appearance made it nearly impossible, even under the circumstances, for the survivors to have confused Defendant, who "was 18 years old, 5'3" in height, and had gold teeth," and Adam Frank, who "was 24 years of age and 6'5" in height." *Id.* "The survivors identified Frank's accomplice as a black male with gold teeth across the top, less than 20 years of age, and just over five feet tall." *Id.*

[25] After the Vus had locked up, Frank and Defendant, a man she previously introduced as her nephew, returned to the restaurant for their third time. See **LaCaze**, 99-0584 at 3, 824 So. 2d at 1066. There were six workers still in the restaurant–four Vu siblings, a waitress, and Officer Williams. *Id.* 99-0584 at 2, 824 So. 2d at 1066. The two surviving Vu siblings testified that they were with Frank near the kitchen area when they heard gunshots in the bar area in the front of the restaurant where Officer Williams was located, after which "Frank spun around and ran towards the bar and the front of the restaurant." See *id.* 99-054 at 3, 824 So.2d at 1067. Defendant and Frank were then seen in the kitchen area "running around, rummaging, 'digging in this little area where [the Vus hid their] money.'" *Id.* 99-0584 at 4, 824 So. 2d at 1067. Shortly after, gunshots were heard from the stove area where the other two Vu siblings were shot. *Id.*

18

Moreover, nothing in the record shows that these unusual circumstances caused Judge Marullo to favor one party.

Defendant places significance on the Supreme Court's decision in **Rippo**, suggesting that the Court found that the trial judge's involvement in an investigation conducted by the prosecuting entity gives rise to an unconstitutional potential for bias. However, the Supreme Court in **Rippo** did not address the merits of the defendant's due process claim, nor by its ruling did it insinuate that the state court's ultimate ruling on the merits of the defendant's due process claim was incorrect.[26] Furthermore, there is nothing in the Supreme Court's remand in **LaCaze** that indicates the Court's belief that the circumstances in **Rippo** and **LaCaze** are sufficiently analogous such that the resolution of the judicial disqualification issue would be the same.

We reject Defendant's claims that "the probability of actual bias" is higher in this case than in **Rippo**. Since Defendant's case does not involve an investigation of the presiding judge by the district attorney's office, the investigation in this case does not involve a possible self-interest that could be considered pecuniary for the judge. The fact that the presiding trial judge in **Rippo** disclosed his impermissible conflict during the course of trial does not lessen the probability of bias created by the underlying investigation and related charges in **Rippo**.

While at first blush the fact that Judge Marullo had information about what was potentially the murder weapon might cause an average observer to question him

---

[26] **Rippo**'s remand was premised not on the lower court having reached an incorrect result, but simply on its having failed to "ask the question our precedents require." See **Rippo**, 137 S.Ct. at 907.

sitting in a capital trial, the circumstances of this case, when carefully examined, do not meet the standard set by the United States Supreme Court in **Rippo**.[27]

Before the allotment of Defendant's case, Judge Marullo was questioned during an internal investigation by the NOPD of one of its officers about the authenticity of the signature that appeared on the court order that authorized the release of a 9 mm gun that may have been used in the murders of Officer Williams and the Vu siblings.[28] Once Defendant's case was assigned to Judge Marullo, he appropriately declined any further comment until the case was resolved. Considering the psychological tendencies of the average judge, as we are required to do,[29] we do not find that the pre-allotment questioning of Judge Marullo and his failure to disclose knowledge of such investigation are the sort of rare and extreme circumstances[30] that would cause the average judge to favor one party so as to be objectively suggestive of bias or a "probability of actual bias." Perhaps the average judge in Judge Marullo's position would have harbored some sensitivity about whether his signature was forged. Realistically, the average judge would be vigilant to avoid being unjustly associated with any wrongdoing surrounding the release of the possible murder weapon to Frank. Although the average judge in this position

---

[27] As previously stated, the appointed judged noted (after extensive proceedings during the post-conviction hearing, in which he heard testimony from Judge Marullo) "[t]his is a classic example of circumstances and appearances creating an inference unsupported by facts."

[28] The fact that NOPD investigated the triple murders and also questioned Judge Marullo in its internal investigation of Officer Talley is not significant in the determination of the probability of actual bias.

[29] The **Rippo-Caperton** standard involves consideration of whether "under a realistic appraisal of psychological tendencies and human weakness," the circumstances "pose [ ] such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." **Caperton**, 556 U.S. at 883-84 (2009) (quoting **Withrow**, 421 U.S. at 47).

[30] The federal constitutional standard for judicial disqualification is implicated only in "rare instances." See **Caperton**, 556 U.S. at 890; see also **Bracy**, 520 U.S. at 904.

may harbor these sensitivities, it does not follow that the average judge would reasonably harbor any bias for or against Defendant because of these sensitivities.

While we do not find proof of a probability of actual bias has been made by Defendant, we also do not find under the circumstances of this case that the defendant's claims have been proven to be "too high to be constitutionally tolerable. See **Federal Trade Commission v. Cement Institute**, 333 U.S. 683, 702 (1948) ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level."). The association between the potential source of bias in this case and what might reasonably be expected to be a judge's anticipated psychological reaction are far too remote and attenuated to show a "probability of actual bias on the part of [Judge Marullo] …[that] is too high to be constitutionally tolerable." Even granting that the inquiry into the authenticity of Judge Marullo's signature was technically related to Defendant's case and may, therefore, have prompted an average judge to disclose this information, Defendant fails to show that Judge Marullo's disputed role in the administrative release of a 9 mm gun was objectively (and realistically) likely to cause bias for or against either party in this case. The controversy at issue in this case markedly differs from the circumstances in those cases which the Supreme Court has found offered "a possible temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true." See **Caperton**, 556 U.S. at 885 (quoting **Tumey**, 273 U.S. at 532). In contrast, it is unclear under the circumstances how the Bureau's internal investigation into the means by which Officer Talley had a 9 mm gun released to Frank or the controversy as to whether Judge Marullo's signature was genuine could significantly and irrevocably color Judge Marullo's perspective such that he would not be in a position "to hold the balance [between Defendant and the prosecution] nice, clear, and true." See *id*.

**DECREE**

For the foregoing reasons, we find that the court of appeal correctly reversed the trial court's order for a new trial and properly reinstated Defendant's conviction. Defendant's request for substantive relief is denied.

**WRIT DENIED.**